**ORAL ARGUMENT DECEMBER 14, 2022**

**Case No. 21-5265**
**(Consolidated with 22-5022)**

---

## IN THE UNITED STATES COURT OF APPEALS FOR
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

WEST FLAGLER ASSOCIATES, LTD., a Florida Limited Partnership

BONITA-FORT MYERS CORPORATION, a Florida Corporation
d/b/a BONITA SPRINGS POKER ROOM,
*Plaintiffs-Appellees*,

v.

DEBRA HAALAND, in her official capacity as Secretary of the
United States Department of the Interior,

UNITED STATES DEPARTMENT OF
THE INTERIOR,
*Defendants-Appellees*,

and

THE SEMINOLE TRIBE OF FLORIDA
*Putative Intervenor-Appellant*

---

On appeal from the United States District Court for the District of Columbia
Case No. 1:21-cv-02192-DLF (Hon. Dabney Friedrich)

---

### APPELLEES' PETITION FOR
### REHEARING *EN BANC*

Boies Schiller Flexner LLP
1401 New York Avenue, NW
Washington, DC 20005

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................... ii

RULE 35 STATEMENT ........................................................................1

INTRODUCTION ................................................................................2

ARGUMENT .......................................................................................4

    I.      THE OPINION RAISES QUESTIONS OF EXCEPTIONAL
           IMPORTANCE REGARDING THE SCOPE OF IGRA AND
           CONFLICTS WITH PRECEDENT FROM OTHER CIRCUITS. ......7

           A.      IGRA Does Not Authorize Approval Of Compacts Purporting
                  To Authorize Gaming Off Of Indian Lands. ...........................7

           B.      The Opinion's Reliance On IGRA's Legislative History Was
                  Also Erroneous..........................................................................11

    II.     REHEARING SHOULD ALSO BE GRANTED TO ADDRESS THE
           EXCEPTIONALLY IMPORTANT EQUAL PROTECTION
           CLAUSE ISSUE. ..............................................................................12

    III.    THE SECRETARY MAY NOT IGNORE VIOLATIONS OF
           FEDERAL LAW ARISING FROM ANCILLARY PROVISIONS OF
           A COMPACT.....................................................................................16

CONCLUSION ...................................................................................16

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUMS

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Am. Fed'n of Gov't Emps., AFL-CIO v. United States*,
    330 F.3d 513 (D.C. Cir. 2003)................................................................. 13, 14

*Amador County v. Salazar*,
    640 F.3d 373 (D.C. Cir. 2011)....................................................................1, 12

*Artichoke Joe's California Grand Casino v. Norton*,
    353 F.3d 712 (9th Cir. 2003) ..........................................................................15

*California v. Cabazon Band of Mission Indians*,
    480 U.S. 202 (1987)........................................................................................12

*California v. Iipay Nation of Santa Ysabel*,
    898 F.3d 960 (9th Cir. 2018) ............................................................................5

*Chicken Ranch Rancheria of Me-Wuk Indians v. California*,
    42 F.4th 1024 (9th Cir. 2022) .....................................................................9, 10

*Fisher v. District Court*,
    424 U.S. 382 (1976).........................................................................................15

*Flandreau Santee Sioux Tribe v. Noem*,
    938 F.3d 928 (8th Cir. 2019) ......................................................................9, 11

*Haaland v. Brackeen*,
    143 S. Ct. 1609 (2023)......................................................................................4

*Michigan v. Bay Mills Indian Cmty.*,
    572 U.S. 782 (2014)...........................................................................................2

*Moe v. Confederated Salish & Kootenai Tribes*,
    425 U.S. 463 (1976)........................................................................................15

*Morton v. Mancari*,
    417 U.S. 535 (1974).......................................................................................13

*Navajo Nation v. Dalley*,
    896 F.3d 1196 (10th Cir. 2018) ..................................................................9, 10

*Rincon Band of Luiseno Mission Indians v. Schwarzenegger*,
  602 F.3d 1019 (9th Cir. 2010) .................................................................10

*Seminole Tribe of Fla. v. Florida*,
  517 U.S. 44 (1996) .................................................................................7

*United States v. Antelope*,
  430 U.S. 641 (1977) ..............................................................................15

*United States v. Calamaro*,
  354 U.S. 351 (1957) ................................................................................5

*United States v. Garrett*,
  122 F. App'x 628 (4th Cir. 2005) .............................................................15

*Williams v. Babbitt*,
  115 F.3d 657 (9th Cir. 1997) ...............................................................4, 15

**Statutes**

25 U.S.C. § 2710(d)(1) ...............................................................................8

25 U.S.C. § 2710(d)(2)(A) ...........................................................................8

25 U.S.C. § 2710(d)(2)(C) ...........................................................................8

25 U.S.C. § 2710(d)(3)(B) ...........................................................................8

25 U.S.C. § 2710(d)(3)(C) .................................................................. 7, 8, 9, 10

25 U.S.C. § 2710(d)(8)(A) ...........................................................................1

25 U.S.C. § 2710(d)(8)(C) ...........................................................................1

Fla. Stat. § 849.14 ....................................................................................12

Fla. Stat. § 849.142 ...................................................................................13

**Other Authorities**

87 Fed. Reg. 74916 ....................................................................................6

Fla. Const. art. X, § 30 ...........................................................................4, 5

## RULE 35 STATEMENT

The June 30, 2023 Panel Opinion (the "Opinion") raises the following questions of exceptional importance:

1) May the Secretary of the Interior (the "Secretary") approve (or allow approval of) a tribal-state compact under the Indian Gaming Regulatory Act ("IGRA") that provides for the tribe to conduct gaming activities ***off*** of Indian lands, given that IGRA limits the Secretary's power to approve compacts to those "between an Indian tribe and a State governing gaming ***on Indian lands of such Indian tribe***." 25 U.S.C. § 2710(d)(8)(A) (all emphases are added unless otherwise noted)[1]; and

2) May the Secretary approve a compact that awards a statewide monopoly on online sports betting to one specific Indian tribe, and thus on the basis of race and ancestry, without identifying compelling or important interests sufficient to satisfy the scrutiny required under the Equal Protection Clause of the U.S. Constitution?

---

[1] The Tribe submitted the Compact to the Secretary for approval. After 45 days of non-action, the compact was "considered to have been approved by the Secretary, but only to the extent the compact is consistent with the provisions of this chapter." 25 U.S.C. § 2710(d)(8)(C). This approval based upon inaction may be challenged under the Administrative Procedure Act. *See Amador County v. Salazar*, 640 F.3d 373, 379-83 (D.C. Cir. 2011).

1

## **INTRODUCTION**

As the Supreme Court held in *Michigan v. Bay Mills Indian Community*, 572 U.S. 782, 795 (2014): "Everything—literally everything—in IGRA affords tools … to regulate gaming ***on Indian lands, and nowhere else***." Until the Opinion in this case, all prior IGRA cases held that, consistent with the plain text of IGRA, the Secretary may approve only those tribal-state compacts that authorize gaming "on Indian lands."

The Opinion departs from this prior case law by holding that a tribe and state may use the IGRA process to obtain Secretarial approval of a compact purportedly authorizing a tribe to conduct gaming ***statewide***, i.e., predominantly ***off*** of Indian lands. It says the Secretary may provide such approval even where—as here—the law of the state prohibits the type of gambling in question if conducted off of Indian lands.

The Opinion makes clear that the Secretary's approval of the 2021 IGRA compact between the Seminole Tribe (the "Tribe") and Florida (the "Compact") does not, and cannot, ***authorize*** the gambling that occurs off of Indian lands. It says that whether that gambling is legal and authorized is purely a question of state law. According to the Opinion, all the IGRA approval is doing is allowing the Compact to discuss, or refer to, the gaming that occurs off of Indian lands.

2

The Opinion is erroneous and will create confusion, and thus rehearing is warranted. The Opinion relies on an interpretation of an IGRA provision itemizing the ancillary subject matters that are permissible in an IGRA compact. As shown by both the plain text of this provision and the overall legislative purpose of IGRA, this provision cannot reasonably be read to allow IGRA compacts to contain provisions that on their face seek to authorize gaming activities off of Indian lands.

The net effect of the Opinion is that a tribe and state may now contract to give the tribe a statewide monopoly on gaming off of Indian lands so long as some of the gaming also occurs on at least one square foot of Indian land. It is unclear whether even a statewide monopoly is the limit; under the Opinion's logic, the Secretary may approve a compact between a tribe and multiple states for a multi-state gaming operation, regardless of the tribe's presence and the legality of gaming in those states—so long as *any portion* of the gaming at issue occurs "on Indian lands." The rest of the gaming, which occurs off Indian lands, may be approved by the Secretary under the theory that it is merely being "discussed" in the compact, not authorized. Op. 10. This cannot be squared with the plain text of IGRA, and the Court should rehear the case *en banc* to reverse.

Further, the Opinion held that rational basis scrutiny applies to the Secretary's federal approval of a state government's award of a statewide gaming monopoly based on race and ancestry. Op. 20. This holding conflicts with the opinion of the

Ninth Circuit in *Williams v. Babbitt*, 115 F.3d 657 (9th Cir. 1997), which the Opinion does not address. Existing law regarding the constitutionality of tribal preferences permits such preferences only where tied to Indian lands, to uniquely sovereign interests, or to the special relationship between the federal government and Indian tribes. The propriety of tribal preferences in and of itself is a question of exceptional importance. *See, e.g., Haaland v. Brackeen*, 143 S. Ct. 1609, 1661 (2023) (Kavanaugh, J. concurring) ("In my view, the equal protection issue is serious."). Here, the preference being given—the state's decision to confer a statewide monopoly on sports gaming to one Indian tribe, while simultaneously making it a felony for any other group or person to offer such gaming—is *not* tied to unique tribal interests. The IGRA approval thus violates the Equal Protection Clause and should have been invalidated on that independent basis.

## ARGUMENT

The Florida Constitution "requires a vote by citizens' initiative"— a statewide referendum—"for casino gambling to be authorized under Florida law." FLA. CONST. art. X, § 30(a) ("Voter Control of Gambling in Florida"). However, it also provides that "nothing herein shall be construed to limit the ability of the state or Native American tribes to negotiate gaming compacts pursuant to the Federal Indian Gaming Regulatory Act for the conduct of casino gambling on tribal lands." *Id.* at

§ 30(c). Thus, the Florida Constitution directly refers to federal law, i.e., IGRA, in carving out an exemption to a general constitutional requirement.

In this case, the Governor of Florida and the Tribe negotiated a compact that authorized the Tribe to offer online "Sports Betting" to any person "physically located in the State." JA686-87 (Compact Part III.CC.2). It then expressly provided that such gaming would be "deemed" to have occurred "exclusively" where the bets were received, which was "on Indian lands." JA692 (Part IV.A); *see also* JA687 (Part II.CC.2). Florida's legislature ratified the Compact in an implementing law, *see* JA753-61, which also "deemed" the online sports betting to occur "exclusively" on tribal lands. JA757.

This was an obvious ruse. It sought to use the federal approval of an IGRA compact for gaming "on Indian lands" to confer a statewide sports betting monopoly on the Tribe, while making such conduct a felony for all other persons. The Compact was thus an abuse of IGRA to bypass a state constitutional requirement. It was also a violation of the Equal Protection Clause.

Numerous authorities hold that gambling occurs both where a bet is placed and where it is received. *See, e.g., United States v. Calamaro*, 354 U.S. 351, 354 (1957) ("Placing and receiving a wager are opposite sides of a single coin. You can't have one without the other."); *California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 967 (9th Cir. 2018); *see also* JA226-35 (letters from National Indian Gaming

Commission rejecting proposed internet gaming reaching off Indian lands). Thus, "deeming" the sports gaming to occur "exclusively" on Indian lands is an artifice that cannot withstand the barest legal scrutiny. That is why the District Court correctly held that the Secretary should have rejected the Compact, or at least its online sports gaming provisions. JA572-77.

Recognizing that they could not defend the "deeming" artifice on appeal, the Secretary and Tribe argued instead that the Compact's provisions authorizing sports gambling off Indian lands were simply "discussed" and "contemplated" in the Compact, so that the Secretary's "approval" of such provisions would not actually "authorize" them. With respect to those provisions, the Secretary's "approval" would just—well, "approve them without authorizing them" (our paraphrasing)— and then state courts could decide whether the ruse worked or not.[2]

The Opinion accepted this argument. It holds that state courts should decide if the Compact's provisions authorizing gaming off Indian lands are legal or not. It expressly says the federal approval does ***not*** "authorize" the off-Indian land sports gaming provisions. But when faced with challenges in state court, the proponents of the Compact will presumably invoke every conceivable immunity defense to try to

---

[2] The Bureau of Indian Affairs is now seeking to entrench this two-tiered system where approval does not mean authorization for some terms by formal rulemaking. 87 Fed. Reg. 74916. Comments have closed on the proposed rule, but there has been no resolution to date.

avoid the obviously illegal off-Indian land gambling provisions being invalidated. Once those defenses are properly rejected (as they should be), the proponents will then presumably argue that the *federal* approval of the IGRA Compact means the Florida constitutional provision has been satisfied. FLA. CONST. art. X, § 30(c).

Federal law should not be abused in this way. The plain text of IGRA does not authorize the Secretary to approve an IGRA compact purporting to authorize gaming off Indian lands. Neither does its legislative purpose. As a matter of federal law, the approval should have been set aside, the District Court's opinion should therefore have been affirmed.

## I.  THE OPINION RAISES QUESTIONS OF EXCEPTIONAL IMPORTANCE REGARDING THE SCOPE OF IGRA AND CONFLICTS WITH PRECEDENT FROM OTHER CIRCUITS.

### A. IGRA Does Not Authorize Approval Of Compacts Purporting To Authorize Gaming Off Of Indian Lands.

25 U.S.C. § 2710(d)(3)(C) provides an exclusive list of ancillary matters that "describes the permissible scope of a Tribal-State compact." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 49 (1996).

The Opinion holds that the Compact's artifice that "deems" online sports bets placed *off* Indian lands to have occurred "exclusively" *on* Indian lands "simply allocates jurisdiction between Florida and the Tribe" under § 2710(d)(3)(C)(i)-(ii). Op. 12-13. This conclusion ignores that the deeming provisions were obviously intended to shoehorn the off-Indian land sports gaming provisions into the IGRA

7

compact exception in the Florida Constitution. On its face, the Compact does not purport to "allocate jurisdiction." Instead, it provides that the "Tribe and State agree that the Tribe is authorized to operate Covered Games on its Indian lands, as defined in [IGRA]." JA692. "Covered Games" are defined to include "Sports Betting," JA676, which in turn is defined to include online, *off-reservation* wagering from *anywhere in the State*, JA687. The "deeming" provisions then convert that *off-reservation* betting into *on-reservation* betting. The whole point is to authorize the Tribe to offer online sports gaming throughout the state.

IGRA does not authorize the Secretary to approve that. The Court should look at the substance of what the proponents did, and not accept disingenuous attempts to justify a ruse intended to abuse the IGRA approval process.

The Opinion alternatively relies on a residual clause at the end of § 2710(d)(3)(C). After enumerating the specific ancillary subject matters that may be included in a compact, § 2710(d)(3)(C) has a final clause that allows compacts to include "any other subjects that are directly related to the operation of gaming activities." 25 U.S.C. § 2710(d)(3)(C)(vii). The "gaming activities" referenced in this provision are quite obviously the "gaming activities" described in the previous sections, which refer to "gaming activities on the Indian lands of the Indian tribe." 25 U.S.C. § 2710(d)(3)(B); *see also* 25 U.S.C. §§ 2710(d)(1) (referring to "gaming activities" that are "on Indian lands"); 2710(d)(2)(A) (same); 2710(d)(2)(C) (same).

Thus, the residual catch-call refers to matters "directly related to the operation of" gaming activities on Indian lands. It cannot reasonably be read to allow a compact to include provisions purporting to authorize gaming activities **off** of Indian lands. Instead, it can only reasonably be read to refer to mechanical matters related to **the operation** of gaming activities **on** Indian lands.

No case has ever read § 2710(d)(3)(C) so expansively, and the Opinion therefore diverges from other circuits' precedent. The Eighth, Ninth and Tenth Circuits each have determined this subsection to be an exhaustive list that **limits** the contents of compacts. *See Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024, 1034 (9th Cir. 2022) ("This list, we hold, is exhaustive."); *id.* at 1035 ("In the context of § 2710(d)(3)(C)'s list of six specific topics followed by a catch-all seventh, it is **more natural to read 'may' in its restrictive sense, as 'may only.**'"); *Navajo Nation v. Dalley*, 896 F.3d 1196, 1205 n.4 (10th Cir. 2018) ("the negotiated terms of the Compact cannot exceed what is authorized by the IGRA") (quotation omitted); *Flandreau Santee Sioux Tribe v. Noem*, 938 F.3d 928, 935 (8th Cir. 2019) ("'Directly related to the operation of gaming activity' is narrower than 'directly related to the operation of the Casino.'").

In *Chicken Ranch*, the Ninth Circuit reviewed compact provisions that would have required tribes to expand family law jurisdiction in their courts, adopt state and national environmental statutes, adopt California tort law, and waive sovereign

9

immunity for tort claims in tribal courts. The Ninth Circuit held that these provisions fell outside the scope of § 2710(d)(3)(C), and that the state could *neither negotiate for* such provisions *nor include them* in an IGRA compact. 42 F.4th at 1037-40; *see also Rincon Band of Luiseno Mission Indians v. Schwarzenegger*, 602 F.3d 1019, 1039 (9th Cir. 2010) ("IGRA *does not permit the State and the tribe to negotiate over any subjects they desire; rather, IGRA anticipates a very specific exchange of rights and obligations.*").

In *Navajo Nation*, the Tenth Circuit reviewed a compact provision assigning jurisdiction to state courts for tort suits arising from injuries at tribal gaming facilities. Although IGRA provides that a compact may include provisions regarding "the allocation of criminal and civil jurisdiction" between a state and tribe, the tribe argued that IGRA permitted jurisdiction shifting only where "'necessary for the enforcement' of laws and regulations that are 'directly related to and necessary for' the licensing and regulation of class III gaming activities." 896 F.3d at 1206. The court agreed, reasoning that "we are unable to discern how applying this form of regulation to a slip-and-fall event … is 'directly related to and necessary for the licensing and regulation' … of Class III gaming activity." *Id.* at 1209 (quoting § 2710(d)(3)(C)(i)). The court also rejected the argument that the jurisdictional shift was permissible under the catchall provision, reasoning that if subsection (vii) "were read to allow for compacts to allocate jurisdiction with respect to *any* subjects

10

directly related to the *operation* of Class III games, the more specific and limited jurisdictional-allocation language of clause (ii) would be (in substance) duplicative, nugatory, and of no effect—i.e., surplusage." *Id.* at 1215-16 (emphasis in original).

In *Flandreau*, the Eighth Circuit addressed the propriety of a state tax on nonmember purchases of amenities at a casino gift shop. The tribe argued that the tax was acceptable under the catchall provision, as "directly related" to gaming activities. The Court rejected this argument, agreeing with *Navajo Nation* that "Class III gaming activity relates only to activities actually involved in the *playing* of the game, and not activities occurring in proximity to, but not inextricably intertwined with, the betting of chips, the folding of a hand, or suchlike." 938 F.3d at 935 (emphasis in original) (quoting *Navajo Nation*, 896 F.3d at 1207).

Further, no case holds that an IGRA approval is sometimes an approval that authorizes what is in the compact, and sometimes is an approval that does not authorize what is in the compact.

**B. The Opinion's Reliance On IGRA's Legislative History Was Also Erroneous.**

The Opinion includes the following reference to IGRA's legislative history and purpose:

> And while there are some limits on what a tribe and state can agree to in an IGRA gaming compact, the purpose of those limits is generally to ensure that states do not use gaming compacts as a backdoor to exercise regulatory power over tribes that they otherwise would not have. That is not a concern in this case.

11

Op. 11.

This use of legislative history is unfounded. The purpose of IGRA is well-established: "Through IGRA, Congress sought to 'balance state, federal, and tribal interests.'" Op. 5 (quoting *Amador*, 640 F.3d at 376). IGRA was thus not enacted solely to protect tribes from overreaching regulatory efforts by states. Far from it, IGRA was enacted in direct response to *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), a decision which invalidated a state's effort to regulate gaming on Indian lands. Op. 5. There is no plausible way to read IGRA as a one-sided protection of tribal gaming against state regulation; it seeks to "balance state, federal, and tribal interests." *Amador*, 640 F.3d at 376.

The goal of balancing the interests of three separate sovereigns cannot be used to justify the federal approval of an IGRA compact that seeks to bypass state constitutional provisions through the artifice of "deeming" gambling that occurs ***off*** of Indian lands as if it occurred ***on*** Indian lands.

## II.   REHEARING SHOULD ALSO BE GRANTED TO ADDRESS THE EXCEPTIONALLY IMPORTANT EQUAL PROTECTION CLAUSE ISSUE.

As part of its approval of the Compact, the Florida Legislature increased the criminal penalties for offering Class III gambling, including sports betting, off of Indian reservations—converting such conduct from a misdemeanor to a felony. FLA. STAT. § 849.14. The Florida Legislature then specifically exempted from

prosecution only those conducting such games pursuant to an IGRA compact, FLA. STAT. § 849.142(1)—i.e., the Tribe's officials, employees and agents engaged in sports gaming. The same exemption from prosecution is found in the Compact itself. JA692, JA676, JA687.

Thus, both the Compact and implementing law distinguish how the state's criminal law is applied to conduct that occurs *off of* Indian lands based upon race and ancestry. No prior case has ever upheld such a distinction from a challenge under the Equal Protection Clause. The Opinion did so with cursory analysis, treating it as subject to rational basis review, citing this Court's decision in *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 330 F.3d 513, 522–23 (D.C. Cir. 2003), and the Supreme Court's decision in *Morton v. Mancari*, 417 U.S. 535, 554 (1974). Op. 20.

In *AFL-CIO*, this Court upheld a U.S. Department of Defense preference for contractual bids submitted by Indian-owned firms because it implicated "tribal commerce … with the federal government" under Article I, § 8 of the Constitution. 330 F.3d at 521. In *Mancari*, the Supreme Court upheld hiring preferences for Indians in the Bureau of Indian Affairs, and reasoned that such preferences should be upheld when they are "reasonable and rationally designed to further Indian self-government" or that "can be tied rationally to the fulfilment of Congress' unique obligation toward the Indians." 417 U.S. at 555.

13

This Court held that *AFL-CIO* was not one of the "obviously more difficult question[s]" mentioned in *Mancari* about expanding preferences beyond close tribally-related issues because Congress acted pursuant to the Indian Commerce Clause, "regulation of commerce with tribes is at the heart of the Clause," and in such interactions "it necessarily must engage in classifications that deal with Indian tribes." 330 F.3d at 521. *AFL-CIO* quoted an earlier D.C. Circuit opinion that when the federal government itself engages in commerce with tribes, "the Constitution itself establishes the rationality of the … classification, by providing a separate federal power that reaches only the present group" and the "Constitution itself provides support for legislation directed specifically at Indian tribes." *Id.* at 521-22 (alteration in original) (quoting *United States v. Cohen*, 733 F.2d 128, 139 (D.C. Cir. 1984)).

Neither *AFL-CIO* nor *Mancari* addressed a state conferring a **statewide** business monopoly on a single tribe; and neither addressed a state applying its criminal law differently, based on race and ancestry, to conduct that occurs **off** of Indian lands.

Likewise, other cases addressing preferences for members of Indian tribes hold that for rational basis review to apply, the preferences must be tied to Indian lands, to uniquely sovereign interests, or to the special relationship between the

14

federal government and Indian tribes.[3] Here, by contrast, the Secretary authorized Florida's grant to the Tribe of a statewide monopoly on the business of sports betting, while more severely criminalizing the conduct when conducted by anyone else.

The case most similar to this one is *Williams v. Babbitt*, 115 F.3d 657 (9th Cir. 1997). In that case, the Ninth Circuit held that strict scrutiny should apply to a rule excluding non-natives from the Alaskan reindeer industry. *Id.* at 664, 666. The court held that the industry was "not uniquely native," and the preference "in no way relate[d] to native land, tribal or communal status, or culture." *Id*. at 664; *see also id.* at 665 ("At oral argument, counsel for the government conceded that granting natives a monopoly on all Space Shuttle contracts would not pass *Mancari*'s rational-relation test.").

The Opinion's decision conflicts with the Ninth Circuit's decision in *Williams*, yet fails even to cite it. This Court should grant rehearing to address the conflict between what the Opinion holds and what the Ninth Circuit held in *Williams* on an issue of exceptional importance: the limits placed by the Equal Protection

---

[3]  *See United States v. Antelope*, 430 U.S. 641, 646 (1977) (federal regulation of criminal conduct within Indian country); *Moe v. Confederated Salish & Kootenai Tribes*, 425 U.S. 463, 480 (1976) (tax "on personal property located within the reservation," fee "applied to a reservation Indian conducting a cigarette business for the Tribe on reservation land," and tax on "on-reservation sales by Indians to Indians"); *Fisher v. District Court*, 424 U.S. 382, 389 (1976) (on-reservation adoption proceedings); *United States v. Garrett*, 122 F. App'x 628, 631 (4th Cir. 2005) (gaming *on* tribal lands); *Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 735 n.16 (9th Cir. 2003) (same).

Clause on states conferring monopolies on Indian tribes for businesses conducted off of Indian lands, and on making distinctions in the criminal law for conduct occurring off of Indian lands.

## III.   THE SECRETARY MAY NOT IGNORE VIOLATIONS OF FEDERAL LAW ARISING FROM ANCILLARY PROVISIONS OF A COMPACT.

Petitioners also respectfully submit that any rehearing should include the issues of whether the Secretary was obligated to disapprove the compact because it violates the Uniform Internet Gambling Enforcement Act ("UIGEA") and the Wire Act. Petitioners' arguments on those points can be found at pages 33-35 (for UIGEA) and at 35-37 (for Wire Act) of their opposition brief (Doc #1967830).

## CONCLUSION

Appellees respectfully request *en banc* rehearing of the Panel Opinion.

August 14, 2023

Respectfully submitted,


By: /s/ *Hamish P.M. Hume*
**BOIES SCHILLER FLEXNER LLP**

Hamish P.M. Hume
Amy L. Neuhardt
Samuel C. Kaplan
1401 New York Avenue, N.W.
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
hhume@bsfllp.com
aneuhardt@bsfllp.com
skaplan@bsfllp.com

16

Jon Mills
100 SE Second Street, Suite 2800
Miami, FL 33131
Tel: (305) 539-8400
Fax: (305) 539-1307
jmills@bsfllp.com

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

This document complies with the word limit of Fed. R. App. P. 35(b)(2)(A) because it contains 3,748 words, excluding the exemptions in Fed. R. App. P. 32(f) and DC Circuit Rule 32(e)(1).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

August 14, 2023

/s/     *Hamish P.M. Hume*
Hamish P.M. Hume

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 14, 2023, this document and all its attachments were filed with the Clerk of the Court of the United States Court of Appeals for the D.C. Circuit by using the CM/ECF system, which will automatically generate and serve notices of this filing to all counsel of record.

Dated: August 14, 2023

*/s/ Hamish P.M. Hume*

Hamish P.M. Hume
1401 New York Ave, N.W.
Washington, DC 2005
Tel: (202) 237-2727
Fax: (202) 237-6131
hhume@bsfllp.com

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 14, 2022          Decided June 30, 2023

No. 21-5265

WEST FLAGLER ASSOCIATES, LTD., A FLORIDA LIMITED
PARTNERSHIP, DOING BUSINESS AS MAGIC CITY CASINO AND
BONITA-FORT MYERS CORPORATION, A FLORIDA
CORPORATION, DOING BUSINESS AS BONITA SPRINGS POKER
ROOM,
APPELLEES

v.

DEBRA A. HAALAND, IN HER OFFICIAL CAPACITY AS
SECRETARY OF THE UNITED STATES DEPARTMENT OF THE
INTERIOR AND UNITED STATES DEPARTMENT OF THE
INTERIOR,
APPELLEES

SEMINOLE TRIBE OF FLORIDA,
APPELLANT

———

Consolidated with 22-5022

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:21-cv-02192)

———

2

*Rachel Heron*, Attorney, U.S. Department of Justice, argued the cause for federal appellants.  With her on the briefs was *Todd Kim*, Assistant Attorney General.

*Barry Richard* argued the cause for appellant Seminole Tribe of Florida.  With him on the briefs were *Joseph H. Webster, Elliott A. Milhollin,* and *Kaitlyn E. Klass.*

*Barry Richard*, *Joseph H. Webster, Elliott A. Milhollin,* and *Kaitlyn E. Klass* were on the brief for *amicus curiae* Seminole Tribe of Florida in support of federal appellants. *Henry C. Whitaker,* Solicitor General, Office of the Attorney General for the State of Florida, argued the cause for *amicus curiae* State of Florida in support of federal appellants.  With him on the brief was *Ashley Moody,* Attorney General, and *Christopher J. Baum*, Senior Deputy Solicitor General.

*Scott Crowell* was on the brief for *amici curiae* The National Indian Gaming Association, et al. in support of federal appellants.

*Todd Kim*, Assistant Attorney General, and *Rachel Heron*, Attorney, U.S. Department of Justice, were on the answering brief for federal appellees.

*Hamish P. M. Hume* argued the cause for appellees West Flagler Associates, Ltd, et al.  With him on the brief were *Amy L. Neuhardt* and *Jon Mills.*

*Jenea M. Reed* argued the cause for *amici curiae* Monterra MF, LLC, et al. in support of appellees.  With her on the brief was *Eugene E. Stearns.*

3

Before: HENDERSON, WILKINS and CHILDS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*:  In 2021, the Seminole Tribe of Florida ("Tribe") and the State of Florida entered into a compact under the Indian Gaming Regulatory Act ("IGRA"), the federal law that regulates gaming on Indian lands.  That gaming compact ("Compact"), along with accompanying changes in state law, purported to permit the Tribe to offer online sports betting throughout the state.  The Compact became effective when the Secretary of the Interior failed to either approve or disapprove it within 45 days of receiving it from the Tribe and Florida.

The Plaintiffs in this case, brick-and-mortar casinos in Florida, object to the Secretary's decision to allow the Compact to go into effect because in their view, it impermissibly authorizes gaming *outside* of Indian lands, violating IGRA. They also believe that the Compact violates the Wire Act, the Unlawful Internet Gambling Enforcement Act, and the Fifth Amendment, and that the Secretary was required to disapprove the Compact for those reasons as well.   The suit named as Defendants the Secretary of the Interior and the Department of the Interior, and the Tribe moved to intervene for the limited purpose of filing a Rule 19 motion to dismiss based on its tribal sovereign immunity.  The District Court denied the Tribe's motion and granted summary judgment for the Plaintiffs, finding that the Compact here "attempts to authorize sports betting both on and off Indian lands[,]" in violation of "IGRA's 'Indian lands' requirement."  *W. Flagler Assocs. v. Haaland*, 573 F. Supp. 3d 260, 273 (D.D.C. 2021).

4

We see the case differently.  IGRA "regulate[s] gaming on Indian lands, and nowhere else."  *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 795 (2014).  Thus, to be sure, an IGRA gaming compact can legally authorize a tribe to conduct gaming only on its own lands.  But at the same time, IGRA does not *prohibit* a gaming compact—which is, at bottom, an agreement between a tribe and a state—from discussing other topics, including those governing activities "outside Indian lands[.]" *Id.* at 796.  In fact, IGRA expressly contemplates that a compact "may" do so where the activity is "directly related to" gaming.  25 U.S.C. § 2710(d)(3)(C)(vii).  The District Court erred by reading into the Compact a legal effect it does not (and cannot) have, namely, independently authorizing betting by patrons located outside of the Tribe's lands.  Rather, the Compact itself authorizes only the betting that occurs on the Tribe's lands; in this respect it satisfied IGRA.  Whether it is otherwise lawful for a patron to place bets from non-tribal land within Florida may be a question for that State's courts, but it is not the subject of this litigation and not for us to decide.  Today, we hold only that the Secretary did not violate the Administrative Procedure Act ("APA") in choosing not to act and thereby allowing the Compact to go into effect by operation of law.  We also find the Plaintiffs' remaining challenges to the Compact meritless, as a matter of law.

Finally, because this decision will effectively keep intact the Compact, resulting in minimal prejudice to the Tribe, we affirm the denial of the Tribe's motion to intervene, albeit on different grounds than did the District Court.  Accordingly, we reverse and remand with instructions to enter judgment for the Secretary.

5

**I.**

**A.**

In 1987, the Supreme Court held that states are powerless to regulate gaming on Indian lands. *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987). In response to that decision, Congress the following year enacted IGRA, 25 U.S.C. § 2701 *et seq.*, which "creates a framework" for doing just that. *Bay Mills*, 572 U.S. at 785. Through IGRA, Congress sought to "balance state, federal, and tribal interests." *Amador Cnty. v. Salazar*, 640 F.3d 373, 376 (D.C. Cir. 2011). IGRA's purposes include "promoting tribal economic development" and "self-sufficiency," "ensur[ing] that the Indian tribe is the primary beneficiary of the gaming operation," and "shield[ing] [tribes] from organized crime and other corrupting influences[.]" 25 U.S.C. § 2702. Both *Cabazon* and IGRA "left fully intact" states' "capacious" regulatory power outside Indian territory. *Bay Mills*, 572 U.S. at 794.

IGRA "divides gaming into three classes." *Id.* at 785. Class III gaming, the kind at issue in this case, is "the most closely regulated" and includes casino games, slot machines, and sports betting. *Id.*; *see also* 25 U.S.C. § 2703(8). A tribe may offer class III gaming on its own lands "only pursuant to, and in compliance with, a compact it has negotiated with the surrounding State." *Bay Mills*, 572 U.S. at 785; *see also* 25 U.S.C. § 2710(d)(1)(C). "A compact typically prescribes rules for operating gaming, allocates law enforcement authority between the tribe and State, and provides remedies for breach of the agreement's terms." *Bay Mills*, 572 U.S. at 785.

Before it takes effect, a tribal-state compact must be approved by the Secretary of the Interior, with notice published in the Federal Register. 25 U.S.C. § 2710(d)(3)(B). When presented with a tribal-state compact, the Secretary can do one

6

of three things.  *See Amador Cnty.*, 640 F.3d at 377
(summarizing the approval process).    First, she may
affirmatively approve the compact. 25 U.S.C. § 2710(d)(8)(A).
Second, she "may disapprove" the compact, but "only if" the
compact violates IGRA, another federal law, or the federal
government's trust obligations to Indians. *Id.* § 2710(d)(8)(B).
Third, if she does not act within 45 days, the compact is
"considered . . . approved[,]" "but only to the extent the
compact is consistent with the provisions of [IGRA]." *Id.*
§ 2710(d)(8)(C).  The Secretary's decision to take no action
within 45 days of receiving the compact, thereby allowing the
compact to go into effect under subsection (C), is judicially
reviewable. *Amador Cnty.*, 640 F.3d at 383.

**B.**

The Seminole Tribe of Florida is a federally recognized
tribal government.   In 2010, it entered into a tribal-state
compact with Florida, so that it could offer certain forms of
class III gaming on its lands.  In 2021, the Tribe and Florida
entered into a new compact, the one at issue in this case
("Compact").    At that time, sports betting was illegal
throughout the state, with exceptions not relevant here. Fla.
Stat. § 849.14.  The Compact and related amendments to state
law changed this, purporting to allow the Tribe the exclusive
right to offer sports betting in the state, including online sports
betting by individuals not physically located on the Tribe's
lands, as follows.

The Compact requires sports bets to be placed
"exclusively by and through one or more sports books
conducted and operated by the Tribe or its approved
management contractor[.]"  J.A. 687 (Compact § III.CC.1).
Under the Compact, the Tribe and Florida in turn consider all
bets placed through the Tribe's sports book, regardless of

7

where the person placing the bet is physically located within the state, to occur where the sports book servers are located—in other words, on tribal land:

> The Tribe and State agree that the Tribe is authorized to operate Covered Games on its Indian lands, as defined in [IGRA]. . . . Subject to limitations set forth herein, wagers on Sports Betting . . . made by players physically located within the State using a mobile or other electronic device shall be deemed to take place exclusively where received at the location of the servers or other devices used to conduct such wagering activity at a Facility on Indian Lands.

J.A. 692 (Compact § IV.A). Similar language appears in another section of the Compact as well. J.A. 687 (Compact § III.CC.2).

The Tribe and Florida executed the Compact in April 2021, and the following month, Governor DeSantis signed a bill that ratified and approved the Compact. That state law adopted the same "deeming" language from the Compact regarding the location of sports bets. Fla. Stat. § 285.710(13)(b)(7) (noting that all sports wagers "shall be deemed to be exclusively conducted by the Tribe where the servers or other devices used to conduct such wagering activity on the Tribe's Indian lands are located[,]" and that "[g]ames and gaming activities authorized under this subsection and conducted pursuant to a gaming compact . . . do not violate the laws of this state"). In June, the Tribe transmitted the Compact to Secretary Haaland for her review under IGRA. She did not act within the 45-day window, and the Compact accordingly went into effect under 25 U.S.C. § 2710(d)(8)(C). The Compact was published in the Federal Register on August 11,

8

2021, making it effective.    Indian Gaming; Approval by Operation of Law of Tribal-State Class III Gaming Compact in the State of Florida, 86 Fed. Reg. 44,037-01 (Aug. 11, 2021).

## C.

The Plaintiffs in this case, West Flagler Associates, Ltd., d/b/a Magic City Casino, and Bonita-Fort Myers Corporation, d/b/a Bonita Springs Poker Room (collectively, "West Flagler"), operate brick-and-mortar casinos in Florida. They sued Secretary Haaland, in her official capacity, and the Department of the Interior (collectively, "the Secretary"), challenging the decision to not act on the Compact within 45 days.    They allege that the Secretary's approval through inaction violated the APA for four reasons:    (1) its authorization of gaming off of Indian lands was unlawful under IGRA, (2) it violated the Wire Act, (3) it violated the Unlawful Internet Gambling Enforcement Act ("UIGEA"), and (4) it violated the Fifth Amendment's equal protection guarantee. The Plaintiffs sought an injunction vacating and setting aside the Compact.

In the District Court, the Tribe moved to intervene for the limited purpose of filing a Rule 19 motion to dismiss.    The Secretary and Plaintiffs opposed the Tribe's motion. Independently, the Secretary moved to dismiss for lack of standing and for failure to state a claim.    The Plaintiffs moved for summary judgment.

The District Court considered all three motions together, along with parallel motions in another case involving a challenge to the same Compact by individuals and entities who are wholly opposed to the expansion of gambling within Florida.    *See Monterra MF, LLC v. Haaland*, No. 21-cv-2513 (D.D.C.) (complaint filed Sept. 27, 2021).    The District Court first denied the Tribe's motion to intervene, finding that it was

9

a required party but that its interests in this litigation were adequately represented by the Secretary, and therefore the litigation could proceed in the Tribe's absence in equity and good conscience. *See* FED. R. CIV. P. 19(b). The District Court then granted summary judgment for the West Flagler Plaintiffs, finding that the Compact violated IGRA because its online sports betting provisions impermissibly attempted to authorize gaming *off* of Indian lands; accordingly, the Secretary had an affirmative duty to reject it. Finding that the entire Compact must be set aside, the District Court finally dismissed the motions in the *Monterra* litigation as moot, and that portion of the decision is not on appeal. (The *Monterra* plaintiffs have appeared as *amici* in this case and urge affirmance.)

The Tribe appealed the denial of its motion to intervene, which the Secretary and Plaintiffs oppose. The Secretary appealed the grant of summary judgment for Plaintiffs.

## II.

We first address the merits of West Flagler's challenge to the Compact, followed by the Tribe's motion to intervene. We review a district court's decision granting summary judgment *de novo*. *Lopez v. Council on American-Islamic Rels. Action Network, Inc.*, 826 F.3d 492, 496 (D.C. Cir. 2016). No material fact is in dispute; the issues on appeal are purely legal.

West Flagler's claims arise under the APA. The APA requires a reviewing court to "hold unlawful and set aside agency action . . . found to be[] (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] (B) contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)–(B). When reviewing a Secretary's decision to not act within the 45-day window when presented with an IGRA compact, this Court has held that 25 U.S.C. § 2710(d)(8)(C) "provides the 'law to apply[]'"—that

10

is, "the compact is deemed approved 'but only to the extent the compact is consistent with the provisions of [IGRA].'" *Amador Cnty.*, 640 F.3d at 381 (alteration in original).

### A.

West Flagler's primary challenge to the Compact is that its online sports betting provisions unlawfully authorize class III gaming outside of Indian lands, in violation of IGRA. In West Flagler's view, our decision in *Amador County* stands for the principle that "IGRA requires the Secretary to 'affirmatively disapprove' any compact that seeks to authorize gaming off Indian lands." West Flagler Br. 20. They argue in turn that the Compact, both in text and effect, necessarily violates that principle. On appeal, the Secretary agrees with the major premise of West Flagler's claim—that IGRA cannot provide an independent source of legal authority for gaming outside of Indian lands—but with one caveat. In her view, "[g]aming outside Indian lands cannot be *authorized* by IGRA, but it may be *addressed* in a compact." Gov't Resp. Br. 2. Thus, the Secretary mainly disputes the minor premise of West Flagler's argument by contending that while the Compact here "discussed" online sports betting off of tribal lands, it did not "authorize" it. And whether or not that gaming is authorized or permissible as a matter of Florida state law falls outside the scope of the Secretary's review. Thus, the logic goes, she had no obligation to disapprove the Compact.

We agree with the Secretary. For our purposes, IGRA's complex regulatory scheme contains two important, related principles. First, IGRA abrogated tribal sovereign immunity for certain gaming activity on Indian lands, and it regulates gaming activity on Indian lands, but "nowhere else." *Bay Mills*, 572 U.S. at 795. This is the core teaching of *Bay Mills*, in which the Supreme Court stated in no uncertain terms:

11

"Everything—literally everything—in IGRA affords tools (for either state or federal officials) to regulate gaming on Indian lands, and nowhere else." *Id.* Put another way, IGRA generally does not restrict or regulate tribal, or any other, activity outside of Indian lands.

Second, while the function of a class III gaming compact is to authorize gaming on Indian lands, it "may include provisions relating to" a litany of other topics. 25 U.S.C. § 2710(d)(3)(C). These include, among other things, "the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;" "the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;" and "any other subjects that are directly related to the operation of gaming activities." *Id.* § 2710(d)(3)(C)(i), (ii), (vii). *Bay Mills* also teaches that such topics can cover state or tribal activity outside of Indian lands. For instance, a state may use a gaming compact to bargain for a waiver of tribal sovereign immunity for a tribe's gaming activity outside of its lands. *See* 572 U.S. at 796–97. And while there are some limits on what a tribe and a state can agree to in an IGRA gaming compact, the purpose of those limits is generally to ensure that states do not use gaming compacts as a backdoor to exercise regulatory power over tribes that they otherwise would not have. That is not a concern in this case.

Following the precept that "a contractual provision should, if possible, be interpreted in such a fashion as to render it lawful rather than unlawful," we find the Compact's text capable of an interpretation in harmony with these two principles. *Papago Tribal Util. Auth. v. FERC*, 723 F.2d 950, 954 (D.C. Cir. 1983); *see also Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1485 (D.C. Cir. 1997) ("[A]n interpretation that makes the contract

12

lawful is preferred to one that renders it unlawful."); 11
WILLISTON ON CONTRACTS § 32:11 (4th ed. May 2023 update)
("Consonant with the principle that all parts of a contract be
given effect when possible, an interpretation which renders a
contract lawful is preferred over one which renders it
unlawful.").  Recall that the key language over which the
parties quarrel is in Compact § IV.A, titled "Authorization and
Location of Covered Games."  It reads:

> The Tribe and State agree that the Tribe is
> authorized to operate Covered Games on its
> Indian lands, as defined in [IGRA.] . . . Subject
> to limitations set forth herein, wagers on Sports
> Betting . . . made by players physically located
> within the State using a mobile or other
> electronic device shall be deemed to take place
> exclusively where received at the location of the
> servers or other devices used to conduct such
> wagering activity at a Facility on Indian Lands.

J.A. 692; *see also* J.A. 687 (Compact § III.CC.2, containing the
same phrasing).

The first sentence of this section simply states that the
Tribe is authorized to operate sports betting on its lands.  This
is uncontroversial and plainly consistent with IGRA.  Next, the
Compact discusses wagers on sports betting "made by players
physically located within the State using a mobile or other
electronic device," which are "deemed to take place
exclusively where received."  The Compact does not say that
these wagers are "authorized" by the Compact (or by any other
legal authority).  Rather, it simply indicates that the parties to
the Compact (*i.e.*, the Tribe and Florida) have agreed that they
both consider such activity (*i.e.*, placing those wagers) to occur
on tribal lands.  Because the Compact requires all gaming

13

disputes be resolved in accordance with tribal law, *see* J.A. 702 (Compact § VI.A), this "deeming" provision simply allocates jurisdiction between Florida and the Tribe, as permitted by 25 U.S.C. § 2710(d)(3)(C)(i)–(ii).

The discussion of wagers placed from outside Indian lands is also "directly related to the operation of" the Tribe's sports book, and thus falls within the scope of § 2710(d)(3)(C)(vii). The Compact "authorizes" only the Tribe's activity on its own lands, that is, operating the sports book and receiving wagers. The lawfulness of any other related activity such as the placing of wagers from outside Indian lands, under state law or tribal law, is unaffected by its inclusion as a topic in the Compact.

West Flagler contends that reading subsection (d)(3)(C)(vii)—the "catch-all" provision—in this way violates the canon that Congress does not hide elephants in mouseholes. We disagree. To be sure, as one of our sister circuits recently noted: "As a residual clause, § 2710(d)(3)(C)(vii) takes its meaning from, and is limited by, the rest of § 2710(d)(3)(C)." *Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024, 1036 (9th Cir. 2022) (citing *Yates v. United States*, 574 U.S. 528, 545 (2015)). But at the same time, "as a residual clause, § 2710(d)(3)(C)(vii) is inevitably broader than the more specific topics enumerated in the paragraphs that precede it." *Chicken Ranch*, 42 F.4th at 1036 (internal quotations and alteration omitted); *see also Republic of Iraq v. Beaty*, 556 U.S. 848, 860 (2009) ("[T]he whole value of a generally phrased residual clause . . . is that it serves as a catchall for matters not specifically contemplated—known unknowns[.]"). Indeed, § 2710(d)(3)(C) covers vast ground, including not only the allocation of civil and criminal jurisdiction between a state and a tribe (no small topic), but also state taxation, remedies for breach of contract, and licensing standards. The power of a state to tax Indian tribes for activity on its own lands, or a

14

tribe's decision to waive its sovereign immunity from suit by a state, *see Bay Mills*, 572 U.S. at 796, are far from "mouseholes." If they are not mouseholes, subsection (d)(3)(C)(vii)—which, as a residual clause, is "inevitably broader"—cannot constitute a mousehole. Thus, gaming activity outside of Indian lands that is directly related to the gaming activity authorized by a compact may appropriately fall within the scope of subsection (d)(3)(C)(vii).

Cases from other circuits interpreting the catch-all provision confirm our understanding. In *Chicken Ranch*, the Ninth Circuit held that provisions relating to family law, environmental law, and tort law—on which California insisted in exchange for permitting the tribe to conduct gaming—could not be the subject of a valid IGRA compact, as they were not directly related to gaming. 42 F.4th at 1037–39. Similarly, the Tenth Circuit has held that subsection (d)(3)(C)(vii) does not permit a compact provision allowing state courts to hear tort suits arising from injuries at Indian casinos. *Navajo Nation v. Dalley*, 896 F.3d 1196, 1218 (10th Cir. 2018). The lesson from these cases is clear and is confirmed by IGRA's legislative history: states cannot use compacts "as a subterfuge for imposing State jurisdiction on tribal lands[,]" *contra* IGRA's purpose. S. Rep. No. 100-466, at 14 (1988). But that is not what happened here.

Nor does *Amador County*, on which West Flagler heavily relies, compel a different result. There, we emphasized that 25 U.S.C. § 2710(d)(8)(A) "authorizes approval only of compacts 'governing gaming on *Indian lands*,' suggesting that disapproval is obligatory where that particular requirement is unsatisfied." 640 F.3d at 381. But in that case, the entirety of the gaming activity discussed in the compact was located on a piece of land known as "the Rancheria," and the dispositive issue was whether the Rancheria constituted Indian lands or

15

not. In other words, if the Rancheria did not qualify as Indian lands, *no* provision of the compact would seek to authorize gaming on Indian lands, and thus any approval would plainly exceed the scope of the Secretary's authority under subsection (d)(8)(A). In contrast, the Compact here authorizes a substantial amount of gaming on Indian lands separate and apart from online wagers placed from outside the Tribe's lands, including Las Vegas-style gambling and in-person sports betting at the Tribe's casinos. That is sufficient to fulfill the "particular requirement" that the Compact "govern[s] gaming on *Indian lands*." *Id.* At bottom, West Flagler's argument invites the Court to read the extraneous word "only" into the preceding statutory language, and we decline to do so.

Finally, West Flagler protests that the Secretary's argument necessarily creates two types of IGRA approvals: (a) for activity on Indian lands, approval authorizes the activity, while (b) for activity outside of Indian lands, approval has no meaning or legal effect. In West Flagler's view, this is problematic because an approved IGRA compact is an "instrument of federal law" which "preempts state law[,]" but it would be illogical and unworkable for only some parts of an approved compact to preempt state law. West Flagler Br. 24–25. However, this argument misunderstands the purpose and effect of an IGRA approval.

To start, neither of the two out-of-circuit cases that West Flagler cites stand for the novel proposition that an IGRA compact has the force of federal law with preemptive power. One of those cases merely states that IGRA compacts are a "creation of federal law," which is uncontroversial and indisputable given their statutory origin but falls far short of supporting West Flagler's argument. *See Citizen Potawatomi Nation v. Oklahoma*, 881 F.3d 1226, 1239 (10th Cir. 2018). The other cited case simply states that an IGRA compact

16

confers upon a tribe a "federal right" to conduct gaming on its own lands, for the purposes of establishing federal court jurisdiction over the action—again, indisputable and beside the point. *See Forest Cnty. Potawatomi Cmty. v. Norquist*, 45 F.3d 1079, 1082 (7th Cir. 1995).

In actuality, the approval process exists so that the Secretary may ensure that a compact does not violate certain federal laws, and her approval is a prerequisite for the compact to have legal effect:  nothing more, nothing less.  Much discussion in the briefs concerns the issue of whether the Tribe and Florida sought to circumvent state constitutional law by including the online sports betting provisions in the Compact. By way of background, in 2018, Florida amended its constitution with a section titled "Voter Control of Gambling in Florida."  Fla. Const. art. X, § 30.  Under that amendment, "Florida voters shall have the exclusive right to decide whether to authorize casino gambling in the State of Florida[,]" which can only be done through "a vote by citizens' initiative."  *Id.* § 30(a).  At the same time, the amendment contains an exception for "casino gambling on tribal lands" pursuant to an IGRA compact.  *Id.* § 30(c).  No voter referendum was ever held regarding online sports betting; therefore, West Flagler argues, the Tribe and Florida would *have* to believe that the IGRA Compact provides the legal basis for that activity.

Whatever the Tribe and Florida—who are not parties to this litigation—may believe, let us be clear:  an IGRA compact cannot provide independent legal authority for gaming activity that occurs outside of Indian lands, where that activity would otherwise violate state law.  That is in fact the position advanced by the Secretary—who *is* a party to this litigation— and we agree.  *See* Oral Arg. Tr. at 6:14–21 (Counsel for the Secretary:  "[I]f the state statute . . . related to this action were to be challenged in Florida state court and were to fall, the

17

compact that they crafted would give no independent authority for the Tribe to continue to receive bets from outside Indian lands.").

Thus, we hold only that the Secretary's decision not to act on the Compact was consistent with IGRA. In reaching this narrow conclusion, we do not give our imprimatur to all of the activity discussed in the Compact. And particularly, for avoidance of doubt, we express no opinion as to whether the Florida statute ratifying the Compact is constitutional under Fla. Const. art. X, § 30. That question and any other related questions of state law are outside the scope of the Secretary's review of the Compact, are outside the scope of our judicial review, and as a prudential matter are best left for Florida's courts to decide.

**B.**

The District Court did not reach West Flagler's Wire Act, UIGEA, and Fifth Amendment challenges to the Compact. But because they have been "fully briefed" and present "purely legal questions[,]" we may decide them. *Assoc. of Am. R.R.s v. U.S. Dep't of Transp.*, 821 F.3d 19, 26 (D.C. Cir. 2016); *see also Consumer Energy Council v. FERC*, 673 F.2d 425, 440 (D.C. Cir. 1982). We conclude that these other challenges lack merit as matter of law.

First, we address the justiciability of these claims. IGRA enumerates a limited number of grounds for which a Secretary "may disapprove a compact[,]" including where the compact violates federal law. 25 U.S.C. § 2710(d)(8)(B)(ii). But where, as here, a compact goes into effect due to the Secretary's inaction, IGRA states that the compact is "approved . . . but only to the extent the compact is consistent with the provisions of this chapter." *Id.* § 2710(d)(8)(C). Because subsection (B) uses "may" rather than "shall," while subsection (C) lists

18

inconsistency with IGRA as the only ground for nullifying a compact considered approved following secretarial inaction, there is a threshold question whether non-IGRA challenges to a compact in these circumstances are judicially reviewable. Dicta from our opinion in *Amador County* strongly suggests that they are, but we have not definitively resolved the question, because the claim in that case was that the compact violated IGRA, not a different federal law.  640 F.3d at 380–83.  But we need not resolve that thorny question here, because even assuming that such claims are justiciable, we find that West Flagler's particular challenges fail as a matter of law.

**1.**

First, West Flagler claims that the Compact authorizes transactions that would violate the federal Wire Act.  The Wire Act prohibits anyone "engaged in the business of betting or wagering" from "knowingly us[ing] a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers . . . on any sporting event or contest[.]"  18 U.S.C. § 1084(a).  The Act has a safe harbor provision for bets placed to and from states or foreign countries where sports betting is lawful.  *Id.* § 1084(b).  Violating the Wire Act is a crime punishable by fine or imprisonment.  *Id.* § 1084(a).

West Flagler contends that "[o]nline communications are almost invariably routed between servers in and out of state between their origin and destination[,]" and therefore any "realistic implementation of the Compact would require use of wire facilities operating in 'interstate and foreign commerce.'"  West Flagler Br. 36.  They further argue that the safe harbor provision does not apply, because Indian lands are neither a state nor a foreign country within the meaning of § 1084(b).  *Id.* at 36 n.17.

19

There are several problems with this line of reasoning. As discussed above, the Compact does not itself independently "authorize" wagers placed by patrons located outside Indian lands. That itself forecloses the Wire Act challenge (and the other claims that follow). And even if the Compact did, no matter the scope of our judicial review, IGRA does not require the Secretary to disapprove a compact based on hypothetical violations of federal criminal law that turn on how the Compact is implemented as well as the *mens rea* of the would-be bettors.

In fact, the Compact contains express language that the Tribe "shall ensure" that its sports book operates in "strict compliance" with the Wire Act. J.A. 707 (Compact § VII.A.1(c)). West Flagler does not contest that it would be technically possible for the Tribe to do so. Moreover, the Wire Act is a criminal statute requiring the government to prove *mens rea* in individual circumstances, a principle at odds with the argument that the Compact as a general matter violates the Act, or that the Secretary was required to disapprove it on that basis. Finally, taking West Flagler's argument to its logical end shows why such a challenge cannot be sustained. Under their view, even online betting by patrons who *are* physically located on Indian lands would violate the Wire Act, because some of those bets may be routed off of Indian lands into a state, and then back. There is no support for the novel and sweeping argument that the Wire Act poses such a broad obstacle to an Indian tribe's ability to offer online gambling on its own lands.

**2.**

In a related vein, West Flagler claims that the Compact violates the UIGEA. That Act prohibits "knowingly accept[ing]" certain forms of payment in connection with "unlawful Internet gambling" such as credit card transactions,

20

checks, and electronic fund transfers. 31 U.S.C. § 5363. This claim suffers from a similar flaw as the Wire Act claim. Even without defining the precise contours of the scope of our review in this case, our review is of the Secretary's decision not to act when presented with the Compact, not whether all hypothetical implementations of the Compact are lawful under all federal statutes. How the Tribe and Florida ultimately implement the Compact in practice, and whether that implementation is consistent with UIGEA, may be the subject of a future lawsuit, but the Compact does not as a facial matter violate the UIGEA. The Secretary was therefore not required to disapprove the Compact on that basis.

**3.**

Lastly, West Flagler argues that the Secretary's approval violates the Fifth Amendment's equal protection guarantee because the Compact impermissibly grants the Tribe a statewide monopoly over online sports betting. But even if the Secretary's approval "authorized" all of the activity in the Compact (as we have explained *supra*, it does not), it would survive rational basis review, which is the applicable level of scrutiny here.

We have held that "promoting the economic development of federally recognized Indian tribes (and thus their members)," if "rationally related to a legitimate legislative purpose[,]" is constitutional. *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 330 F.3d 513, 522–23 (D.C. Cir. 2003); *see Morton v. Mancari*, 417 U.S. 535, 554 (1974) (upholding a preference for members of Indian tribes where "reasonably and directly related to a legitimate, nonracially based goal"). The exclusivity provisions in the Compact plainly promote the economic development of the Seminole Tribe. They are also rationally related to the legitimate legislative purposes laid out

21

in IGRA by "ensur[ing] that the Indian tribe is the primary beneficiary of the gaming operation[.]" 25 U.S.C. § 2702(2). Thus, West Flagler's equal protection challenge fails as a matter of law.

**III.**

Having determined that West Flagler's challenges to the Compact lack merit and judgment for the Secretary is warranted, we are left to decide the Tribe's motion to intervene. The Tribe moved to intervene as of right under Rule 24(a), for the limited purpose of filing a motion to dismiss under Rule 19. In short, a party seeking dismissal under Rule 19 must show that it is a required party that cannot be joined, and without whom the litigation cannot proceed.

Formally, "Rule 19 analysis has two steps." *De Csepel v. Republic of Hungary*, 27 F.4th 736, 746 (D.C. Cir. 2022). "We first determine whether an absent party is 'required'" under Rule 19(a). *Id.* Relevant here, a party is required where it "claims an interest relating to the subject of the action and . . . disposing of the action in the person's absence may . . . as a *practical* matter impair or impede the person's ability to protect the interest[.]" FED. R. CIV. P. 19(a)(1)(B)(i) (emphasis added). If a party is required but cannot be joined (for instance, due to its sovereign immunity), the court must next determine "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." FED. R. CIV. P. 19(b). Courts refer to step two of this analysis as determining whether the party is "indispensable." *De Csepel*, 27 F.4th at 748. In doing so, a court considers four factors: (1) whether "a judgment rendered in the person's absence might prejudice that person or the existing parties[,]" (2) whether such prejudice can be "lessened or avoided[,]" (3) "whether a judgment rendered in the person's absence would

22

be adequate[,]" and (4) "whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder." FED. R. CIV. P. 19(b). The Rule 19 inquiry is equitable and discretionary. *See Kickapoo Tribe of Indians v. Babbitt*, 43 F.3d 1491, 1495 (D.C. Cir. 1995); *De Csepel*, 27 F.4th at 747.

The District Court first concluded that the Tribe's proposed Rule 19 motion to dismiss lacked merit. It then denied the Rule 24 motion to intervene as moot. Because the Tribe will suffer minimal to no prejudice in light of this Court's ruling on the merits, we affirm the denial of the motion to intervene on alternate grounds.

Ordinarily, a court decides a prospective party's motion to intervene before summary judgment. The District Court's analysis proceeded in that sequence, though it decided both motions in the same order, and both are presented in this appeal. Our decision to resolve the merits of the case before deciding the Tribe's motion to intervene in *this* instance heeds the well-settled principle that Rule 19 "calls for a pragmatic decision based on practical considerations in the context of particular litigation." *Kickapoo Tribe*, 43 F.3d at 1495; *cf. Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 577–78 (1999) (a court may resolve a case by concluding that it lacks personal jurisdiction before confirming its subject-matter jurisdiction where the former presents an easier question, even though the latter delineates more foundational limits on a federal court's Article III power to decide a case). As the Advisory Committee Notes to the Federal Rules state, the Rule 19 inquiry is meant, above all, to be "practical," and courts should ask: "Would the absentee be adversely affected in a practical sense, and if so, would the prejudice be immediate and serious, or remote and minor?" FED. R. CIV. P. 19 advisory committee's note to 1966 amendment; *see also* 7 CHARLES A. WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. CIV. § 1608 (3d ed. Apr. 2023

23

update) ("[C]ourts must look to the practical likelihood of prejudice . . . rather than the theoretical possibility that [it] may occur.").  This principle underlies the rule itself and is the reason a case may proceed when a non-party's interests are adequately represented by a party.

Here, there is little practical difference between a Rule 19 dismissal on the one hand, and a judgment for the Secretary on the other.  Both would keep intact the 2021 Compact, the relief that the Tribe ultimately seeks.  In fact, the Tribe did not shy away from expressing its views on the merits of this case; it filed an *amicus* brief explaining the reasons it believes the District Court erred in vacating the Compact, separate and apart from the denial of its motion to intervene.  While the ability to file an *amicus* brief is never *per se* "enough to eliminate prejudice," *Wichita & Affiliated Tribes v. Hodel*, 788 F.2d 765, 775 (D.C. Cir. 1986), the Tribe's brief lessens whatever prejudice it would suffer from having this issue resolved favorably in its absence.  In reaching this conclusion, we do not discount or take lightly the Tribe's "substantial interest" in its sovereign immunity, *see Republic of Philippines v. Pimentel*, 553 U.S. 851, 868–69 (2008), but we ultimately find that any infringement on that immunity is "remote" and "theoretical" in these unique circumstances.  Because Rule 19's guiding "philosophy . . . is to avoid dismissal whenever possible[,]" we find that the practical benefits of deciding this case on the merits outweighs any prejudice to the Tribe.  7 CHARLES A. WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. CIV. § 1604 (3d ed. Apr. 2023 update).

\*    \*    \*

For these reasons, we vacate the opinion below, and the District Court is directed to enter judgment for the Secretary. We affirm the denial of the Tribe's motion to intervene.

24

*It is so ordered.*

## ADDENDUM: CERTIFICATE AS TO PARTIES

Pursuant to D.C. Circuit Rule 35(c) and D.C. Circuit Rule 28(a)(1)(A), undersigned counsel for appellees Bonita-Fort Myers Corporation and West Flagler Associates, Ltd. certifies as follows:

### (A)        Parties and Amici

The following parties and amici have appeared before both the District Court and this Court:

1. *Plaintiffs-appellees*: Bonita-Fort Myers Corporation, a Florida Corporation d/b/a Bonita Springs Poker Room ("Bonita"); and West Flagler Associates, Ltd., a Florida Limited Partnership ("West Flagler"). Both are wholly owned by Southwest Florida Enterprises, Inc. No publicly traded corporation owns more than 10% of either company's stock.

2. *Defendants-appellees*: Debra Haaland, in her official capacity as Secretary of the United States Department of the Interior (the "Secretary"); and United States Department of the Interior ("DOI"). The Secretary and the DOI opposed in the District Court that portion of the Seminole Tribe of Florida's motion that sought dismissal of the case under FRCP 19.

1

3. *Putative Intervenor-Appellant and Amicus Curiae*: The Seminole Tribe of Florida (the "Tribe") moved to intervene in the District Court for limited jurisdiction intervention so that it could then file a motion to have the case dismissed under FRCP 19. That motion to intervene was denied as moot on November 22, 2021. The Tribe also filed an amicus brief in support of Defendants-Appellees the Secretary and DOI.

4. *Amici Curiae*: Monterra MF, LLC; Armando Codina; James Carr; Norman Braman; 2020 Biscayne Boulevard, LLC; 2060 Biscayne Boulevard, LLC; 2060 NE 2nd Avenue, LLC; 246 NE 20th Terrace, LLC; and No Casinos. All amici were plaintiffs in a related case in the District Court.

5. *Amicus Curiae*: The State of Florida filed an amicus brief in support of Defendants-Appellees the Secretary and DOI.

6. *Amici Curiae*: The National Indian Gaming Association, The United South and Eastern Tribes Sovereignty Protection Fund, The California Nations Indian Gaming Association, The Arizona Indian Gaming Association and ten federally recognized Indian Tribes (Confederated Tribes of Siletz Indians, Coquille Indian Tribe, Estom Yumeka Maidu Tribe of the Enterprise Rancheria, Guidiville Rancheria of California, Redding Rancheria, Rincon Band of Luiseno Indians, Tunica-Beloxi

2

Tribe of Louisiana, Wampanoag Tribe of Gay Head (Aquinnah), Wilton Rancheria, and the Yuhaaviatam of San Manuel Nation) filed an amicus brief in this Court in support of Defendants-Appellees the Secretary and DOI and Putative-Intervenor Appellant the Tribe.

August 14, 2023

By: /s/ *Hamish P.M. Hume*

Hamish P.M. Hume
1401 New York Avenue, N.W.
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
hhume@bsfllp.com

# ADDENDUM:  RULE 26.1 DISCLOSURE STATEMENT

Pursuant to D.C. Circuit Rule 35(c), Federal Rule of Appellate Procedure 26.1, and D.C. Circuit Rule 26.1, Appellees Bonita-Fort Myers Corporation, a Florida Corporation d/b/a Bonita Springs Poker Room ("Bonita") and West Flagler Associates, Ltd., a Florida Limited Partnership ("West Flagler"), hereby file this Disclosure Statement.

I, the undersigned, counsel of record for Bonita and West Flagler, certify that to the best of my knowledge and belief, the following are parent companies, subsidiaries, affiliates, or companies which own at least 10% of the stock of Bonita or 10% of the partnership interest of West Flagler and that have any outstanding securities in the hands of the public:

- Southwest Florida Enterprises, Inc., wholly owns Bonita and is the majority owner of West Flagler;

- I am not aware of any publicly traded corporation that owns 10% or more of the stock of Southwest Florida Enterprises or Bonita Springs, or 10% or more of the partnership interest of West Flagler.

Bonita is a corporation registered in the State of Florida, with its principal place of business located at 866 Ponce DeLeon Blvd., Coral Gables, FL 33134. Bonita operates Bonita Springs Poker Room in Bonita Springs, Florida. It offers card games for gaming purposes and competes with the Seminole Tribe for gaming

patrons and will be harmed by the expansion of gaming to permit off-reservation online sports gambling.

West Flagler is a limited partnership registered in the State of Florida, with its principal place of business located at 866 Ponce DeLeon Blvd., Coral Gables, FL 33134. West Flagler owns permits to operate three jai alai frontons for gaming purposes. It competes with the Seminole Tribe for gaming patrons and will be harmed by the expansion of gaming to permit off-reservation online sports gambling.

These representations are made in order that the judges of this Court may determine the need for recusal.

Attorney of Record

*/s/ Hamish P.M. Hume*

Hamish P.M. Hume
1401 New York Ave, N.W.
Washington, DC 2005
Tel: (202) 237-2727
Fax: (202) 237-6131
hhume@bsfllp.com

# ADDENDUM OF STATUTES AND REGULATIONS

<u>Federal Statutes</u>

25 U.S.C. § 2710                                                                                    A-001

| United States Code Annotated |
| :--- |
| Title 25. Indians (Refs & Annos) |
| Chapter 29. Indian Gaming Regulation (Refs & Annos) |

25 U.S.C.A. § 2710

§ 2710. Tribal gaming ordinances

Currentness

**(a) Jurisdiction over class I and class II gaming activity**

**(1)** Class I gaming on Indian lands is within the exclusive jurisdiction of the Indian tribes and shall not be subject to the provisions of this chapter.

**(2)** Any class II gaming on Indian lands shall continue to be within the jurisdiction of the Indian tribes, but shall be subject to the provisions of this chapter.

**(b) Regulation of class II gaming activity; net revenue allocation; audits; contracts**

**(1)** An Indian tribe may engage in, or license and regulate, class II gaming on Indian lands within such tribe's jurisdiction, if--

**(A)** such Indian gaming is located within a State that permits such gaming for any purpose by any person, organization or entity (and such gaming is not otherwise specifically prohibited on Indian lands by Federal law), and

**(B)** the governing body of the Indian tribe adopts an ordinance or resolution which is approved by the Chairman.

A separate license issued by the Indian tribe shall be required for each place, facility, or location on Indian lands at which class II gaming is conducted.

**(2)** The Chairman shall approve any tribal ordinance or resolution concerning the conduct, or regulation of class II gaming on the Indian lands within the tribe's jurisdiction if such ordinance or resolution provides that--

**(A)** except as provided in paragraph (4), the Indian tribe will have the sole proprietary interest and responsibility for the conduct of any gaming activity;

**(B)** net revenues from any tribal gaming are not to be used for purposes other than--

**(i)** to fund tribal government operations or programs;

**(ii)** to provide for the general welfare of the Indian tribe and its members;

**(iii)** to promote tribal economic development;

**(iv)** to donate to charitable organizations; or

**(v)** to help fund operations of local government agencies;

**(C)** annual outside audits of the gaming, which may be encompassed within existing independent tribal audit systems, will be provided by the Indian tribe to the Commission;

**(D)** all contracts for supplies, services, or concessions for a contract amount in excess of $25,000 annually (except contracts for professional legal or accounting services) relating to such gaming shall be subject to such independent audits;

**(E)** the construction and maintenance of the gaming facility, and the operation of that gaming is conducted in a manner which adequately protects the environment and the public health and safety; and

**(F)** there is an adequate system which--

**(i)** ensures that background investigations are conducted on the primary management officials and key employees of the gaming enterprise and that oversight of such officials and their management is conducted on an ongoing basis; and

**(ii)** includes--

**(I)** tribal licenses for primary management officials and key employees of the gaming enterprise with prompt notification to the Commission of the issuance of such licenses;

**(II)** a standard whereby any person whose prior activities, criminal record, if any, or reputation, habits and associations pose a threat to the public interest or to the effective regulation of gaming, or create or enhance the dangers of unsuitable, unfair, or illegal practices and methods and activities in the conduct of gaming shall not be eligible for employment; and

**(III)** notification by the Indian tribe to the Commission of the results of such background check before the issuance of any of such licenses.

**(3)** Net revenues from any class II gaming activities conducted or licensed by any Indian tribe may be used to make per capita payments to members of the Indian tribe only if--

**(A)** the Indian tribe has prepared a plan to allocate revenues to uses authorized by paragraph (2)(B);

**(B)** the plan is approved by the Secretary as adequate, particularly with respect to uses described in clause (i) or (iii) of paragraph (2)(B);

**(C)** the interests of minors and other legally incompetent persons who are entitled to receive any of the per capita payments are protected and preserved and the per capita payments are disbursed to the parents or legal guardian of such minors or legal incompetents in such amounts as may be necessary for the health, education, or welfare, of the minor or other legally incompetent person under a plan approved by the Secretary and the governing body of the Indian tribe; and

**(D)** the per capita payments are subject to Federal taxation and tribes notify members of such tax liability when payments are made.

**(4)(A)** A tribal ordinance or resolution may provide for the licensing or regulation of class II gaming activities owned by any person or entity other than the Indian tribe and conducted on Indian lands, only if the tribal licensing requirements include the requirements described in the subclauses of subparagraph (B)(i) and are at least as restrictive as those established by State law governing similar gaming within the jurisdiction of the State within which such Indian lands are located. No person or entity, other than the Indian tribe, shall be eligible to receive a tribal license to own a class II gaming activity conducted on Indian lands within the jurisdiction of the Indian tribe if such person or entity would not be eligible to receive a State license to conduct the same activity within the jurisdiction of the State.

**(B)(i)** The provisions of subparagraph (A) of this paragraph and the provisions of subparagraphs (A) and (B) of paragraph (2) shall not bar the continued operation of an individually owned class II gaming operation that was operating on September 1, 1986, if--

**(I)** such gaming operation is licensed and regulated by an Indian tribe pursuant to an ordinance reviewed and approved by the Commission in accordance with section 2712 of this title,

**(II)** income to the Indian tribe from such gaming is used only for the purposes described in paragraph (2)(B) of this subsection,

**(III)** not less than 60 percent of the net revenues is income to the Indian tribe, and

**(IV)** the owner of such gaming operation pays an appropriate assessment to the National Indian Gaming Commission under section 2717(a)(1) of this title for regulation of such gaming.

**(ii)** The exemption from the application of this subsection provided under this subparagraph may not be transferred to any person or entity and shall remain in effect only so long as the gaming activity remains within the same nature and scope as operated on October 17, 1988.

**(iii)** Within sixty days of October 17, 1988, the Secretary shall prepare a list of each individually owned gaming operation to which clause (i) applies and shall publish such list in the Federal Register.

**(c) Issuance of gaming license; certificate of self-regulation**

**(1)** The Commission may consult with appropriate law enforcement officials concerning gaming licenses issued by an Indian tribe and shall have thirty days to notify the Indian tribe of any objections to issuance of such license.

**(2)** If, after the issuance of a gaming license by an Indian tribe, reliable information is received from the Commission indicating that a primary management official or key employee does not meet the standard established under subsection (b)(2)(F)(ii)(II), the Indian tribe shall suspend such license and, after notice and hearing, may revoke such license.

**(3)** Any Indian tribe which operates a class II gaming activity and which--

    **(A)** has continuously conducted such activity for a period of not less than three years, including at least one year after October 17, 1988; and

    **(B)** has otherwise complied with the provisions of this section [1]

may petition the Commission for a certificate of self-regulation.

**(4)** The Commission shall issue a certificate of self-regulation if it determines from available information, and after a hearing if requested by the tribe, that the tribe has--

    **(A)** conducted its gaming activity in a manner which--

        **(i)** has resulted in an effective and honest accounting of all revenues;

        **(ii)** has resulted in a reputation for safe, fair, and honest operation of the activity; and

        **(iii)** has been generally free of evidence of criminal or dishonest activity;

    **(B)** adopted and is implementing adequate systems for--

        **(i)** accounting for all revenues from the activity;

        **(ii)** investigation, licensing, and monitoring of all employees of the gaming activity; and

        **(iii)** investigation, enforcement and prosecution of violations of its gaming ordinance and regulations; and

**(C)** conducted the operation on a fiscally and economically sound basis.

**(5)** During any year in which a tribe has a certificate for self-regulation--

**(A)** the tribe shall not be subject to the provisions of paragraphs (1), (2), (3), and (4) of section 2706(b) of this title;

**(B)** the tribe shall continue to submit an annual independent audit as required by subsection (b)(2)(C) and shall submit to the Commission a complete resume on all employees hired and licensed by the tribe subsequent to the issuance of a certificate of self-regulation; and

**(C)** the Commission may not assess a fee on such activity pursuant to section 2717 of this title in excess of one quarter of 1 per centum of the gross revenue.

**(6)** The Commission may, for just cause and after an opportunity for a hearing, remove a certificate of self-regulation by majority vote of its members.

**(d) Class III gaming activities; authorization; revocation; Tribal-State compact**

**(1)** Class III gaming activities shall be lawful on Indian lands only if such activities are--

**(A)** authorized by an ordinance or resolution that--

**(i)** is adopted by the governing body of the Indian tribe having jurisdiction over such lands,

**(ii)** meets the requirements of subsection (b), and

**(iii)** is approved by the Chairman,

**(B)** located in a State that permits such gaming for any purpose by any person, organization, or entity, and

**(C)** conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect.

**(2)(A)** If any Indian tribe proposes to engage in, or to authorize any person or entity to engage in, a class III gaming activity on Indian lands of the Indian tribe, the governing body of the Indian tribe shall adopt and submit to the Chairman an ordinance or resolution that meets the requirements of subsection (b).

**(B)** The Chairman shall approve any ordinance or resolution described in subparagraph (A), unless the Chairman specifically determines that--

**(i)** the ordinance or resolution was not adopted in compliance with the governing documents of the Indian tribe, or

**(ii)** the tribal governing body was significantly and unduly influenced in the adoption of such ordinance or resolution by any person identified in section 2711(e)(1)(D) of this title.

Upon the approval of such an ordinance or resolution, the Chairman shall publish in the Federal Register such ordinance or resolution and the order of approval.

**(C)** Effective with the publication under subparagraph (B) of an ordinance or resolution adopted by the governing body of an Indian tribe that has been approved by the Chairman under subparagraph (B), class III gaming activity on the Indian lands of the Indian tribe shall be fully subject to the terms and conditions of the Tribal-State compact entered into under paragraph (3) by the Indian tribe that is in effect.

**(D)(i)** The governing body of an Indian tribe, in its sole discretion and without the approval of the Chairman, may adopt an ordinance or resolution revoking any prior ordinance or resolution that authorized class III gaming on the Indian lands of the Indian tribe. Such revocation shall render class III gaming illegal on the Indian lands of such Indian tribe.

**(ii)** The Indian tribe shall submit any revocation ordinance or resolution described in clause (i) to the Chairman. The Chairman shall publish such ordinance or resolution in the Federal Register and the revocation provided by such ordinance or resolution shall take effect on the date of such publication.

**(iii)** Notwithstanding any other provision of this subsection--

**(I)** any person or entity operating a class III gaming activity pursuant to this paragraph on the date on which an ordinance or resolution described in clause (i) that revokes authorization for such class III gaming activity is published in the Federal Register may, during the 1-year period beginning on the date on which such revocation ordinance or resolution is published under clause (ii), continue to operate such activity in conformance with the Tribal-State compact entered into under paragraph (3) that is in effect, and

**(II)** any civil action that arises before, and any crime that is committed before, the close of such 1-year period shall not be affected by such revocation ordinance or resolution.

**(3)(A)** Any Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities. Upon receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact.

USCA Case #22-5022    Document #2012403    Filed: 08/14/2023    Page 60 of 63

**(B)** Any State and any Indian tribe may enter into a Tribal-State compact governing gaming activities on the Indian lands of the Indian tribe, but such compact shall take effect only when notice of approval by the Secretary of such compact has been published by the Secretary in the Federal Register.

**(C)** Any Tribal-State compact negotiated under subparagraph (A) may include provisions relating to--

**(i)** the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;

**(ii)** the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;

**(iii)** the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;

**(iv)** taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;

**(v)** remedies for breach of contract;

**(vi)** standards for the operation of such activity and maintenance of the gaming facility, including licensing; and

**(vii)** any other subjects that are directly related to the operation of gaming activities.

**(4)** Except for any assessments that may be agreed to under paragraph (3)(C)(iii) of this subsection, nothing in this section shall be interpreted as conferring upon a State or any of its political subdivisions authority to impose any tax, fee, charge, or other assessment upon an Indian tribe or upon any other person or entity authorized by an Indian tribe to engage in a class III activity. No State may refuse to enter into the negotiations described in paragraph (3)(A) based upon the lack of authority in such State, or its political subdivisions, to impose such a tax, fee, charge, or other assessment.

**(5)** Nothing in this subsection shall impair the right of an Indian tribe to regulate class III gaming on its Indian lands concurrently with the State, except to the extent that such regulation is inconsistent with, or less stringent than, the State laws and regulations made applicable by any Tribal-State compact entered into by the Indian tribe under paragraph (3) that is in effect.

**(6)** The provisions of section 1175 of Title 15 shall not apply to any gaming conducted under a Tribal-State compact that--

**(A)** is entered into under paragraph (3) by a State in which gambling devices are legal, and

**(B)** is in effect.

**(7)(A)** The United States district courts shall have jurisdiction over--

**(i)** any cause of action initiated by an Indian tribe arising from the failure of a State to enter into negotiations with the Indian tribe for the purpose of entering into a Tribal-State compact under paragraph (3) or to conduct such negotiations in good faith,

**(ii)** any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact entered into under paragraph (3) that is in effect, and

**(iii)** any cause of action initiated by the Secretary to enforce the procedures prescribed under subparagraph (B)(vii).

**(B)(i)** An Indian tribe may initiate a cause of action described in subparagraph (A)(i) only after the close of the 180-day period beginning on the date on which the Indian tribe requested the State to enter into negotiations under paragraph (3)(A).

**(ii)** In any action described in subparagraph (A)(i), upon the introduction of evidence by an Indian tribe that--

**(I)** a Tribal-State compact has not been entered into under paragraph (3), and

**(II)** the State did not respond to the request of the Indian tribe to negotiate such a compact or did not respond to such request in good faith,

the burden of proof shall be upon the State to prove that the State has negotiated with the Indian tribe in good faith to conclude a Tribal-State compact governing the conduct of gaming activities.

**(iii)** If, in any action described in subparagraph (A)(i), the court finds that the State has failed to negotiate in good faith with the Indian tribe to conclude a Tribal-State compact governing the conduct of gaming activities, the court shall order the State and the Indian Tribe [2] to conclude such a compact within a 60-day period. In determining in such an action whether a State has negotiated in good faith, the court--

**(I)** may take into account the public interest, public safety, criminality, financial integrity, and adverse economic impacts on existing gaming activities, and

**(II)** shall consider any demand by the State for direct taxation of the Indian tribe or of any Indian lands as evidence that the State has not negotiated in good faith.

**(iv)** If a State and an Indian tribe fail to conclude a Tribal-State compact governing the conduct of gaming activities on the Indian lands subject to the jurisdiction of such Indian tribe within the 60-day period provided in the order of a court issued under clause (iii), the Indian tribe and the State shall each submit to a mediator appointed by the court a proposed compact that represents their last best offer for a compact. The mediator shall select from the two proposed compacts the one which best comports with the terms of this chapter and any other applicable Federal law and with the findings and order of the court.

USCA Case #22-5022    Document #2012403    Filed: 08/14/2023    Page 62 of 63

**(v)** The mediator appointed by the court under clause (iv) shall submit to the State and the Indian tribe the compact selected by the mediator under clause (iv).

**(vi)** If a State consents to a proposed compact during the 60-day period beginning on the date on which the proposed compact is submitted by the mediator to the State under clause (v), the proposed compact shall be treated as a Tribal-State compact entered into under paragraph (3).

**(vii)** If the State does not consent during the 60-day period described in clause (vi) to a proposed compact submitted by a mediator under clause (v), the mediator shall notify the Secretary and the Secretary shall prescribe, in consultation with the Indian tribe, procedures--

   **(I)** which are consistent with the proposed compact selected by the mediator under clause (iv), the provisions of this chapter, and the relevant provisions of the laws of the State, and

   **(II)** under which class III gaming may be conducted on the Indian lands over which the Indian tribe has jurisdiction.

**(8)(A)** The Secretary is authorized to approve any Tribal-State compact entered into between an Indian tribe and a State governing gaming on Indian lands of such Indian tribe.

**(B)** The Secretary may disapprove a compact described in subparagraph (A) only if such compact violates--

   **(i)** any provision of this chapter,

   **(ii)** any other provision of Federal law that does not relate to jurisdiction over gaming on Indian lands, or

   **(iii)** the trust obligations of the United States to Indians.

**(C)** If the Secretary does not approve or disapprove a compact described in subparagraph (A) before the date that is 45 days after the date on which the compact is submitted to the Secretary for approval, the compact shall be considered to have been approved by the Secretary, but only to the extent the compact is consistent with the provisions of this chapter.

**(D)** The Secretary shall publish in the Federal Register notice of any Tribal-State compact that is approved, or considered to have been approved, under this paragraph.

**(9)** An Indian tribe may enter into a management contract for the operation of a class III gaming activity if such contract has been submitted to, and approved by, the Chairman. The Chairman's review and approval of such contract shall be governed by the provisions of subsections (b), (c), (d), (f), (g), and (h) of section 2711 of this title.

USCA Case #22-5022      Document #2012403            Filed: 08/14/2023       Page 63 of 63

**(e) Approval of ordinances**

For purposes of this section, by not later than the date that is 90 days after the date on which any tribal gaming ordinance or resolution is submitted to the Chairman, the Chairman shall approve such ordinance or resolution if it meets the requirements of this section. Any such ordinance or resolution not acted upon at the end of that 90-day period shall be considered to have been approved by the Chairman, but only to the extent such ordinance or resolution is consistent with the provisions of this chapter.

**CREDIT(S)**

(Pub.L. 100-497, § 11, Oct. 17, 1988, 102 Stat. 2472.)

**Footnotes**

1        So in original. Probably should be followed by a comma.

2        So in original. Probably should not be capitalized.

25 U.S.C.A. § 2710, 25 USCA § 2710
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.