**ORAL ARGUMENT HELD DECEMBER 14, 2022**

**Case No. 21-5265**
**(Consolidated with 22-5022)**

---

**IN THE UNITED STATES COURT OF APPEALS FOR**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

WEST FLAGLER ASSOCIATES, LTD., a Florida Limited Partnership,

BONITA-FORT MYERS CORPORATION, a Florida Corporation
d/b/a BONITA SPRINGS POKER ROOM,
*Plaintiffs-Appellees*,

v.

DEBRA HAALAND, in her official capacity as Secretary of the
United States Department of the Interior,

UNITED STATES DEPARTMENT OF
THE INTERIOR,
*Defendants-Appellees*,

and

THE SEMINOLE TRIBE OF FLORIDA
*Putative Intervenor-Appellant*

---

On appeal from the United States District Court for the District of Columbia
Case No. 1:21-cv-02192-DLF (Hon. Dabney Friedrich)

---

**APPELLEES' MOTION TO STAY MANDATE PENDING PETITION FOR**
**WRIT OF CERTIORARI**

Boies Schiller Flexner LLP
1401 New York Avenue, NW
Washington, DC 20005

**<u>TABLE OF CONTENTS</u>**

INTRODUCTION ............................................................................................1

STATEMENT OF FACTS AND BACKGROUND ...............................................5

ARGUMENT ................................................................................................6

    A.    The Panel Opinion Raises "Substantial Questions" of Law ................7

        1.    The Panel's Interpretation of IGRA Significantly Expands IGRA's Scope and Authorizes Significant Expansions of Legalized Betting Throughout the Country ...............................7

        2.    The Panel's Analysis of the Propriety of the Tribal Preference Granted by the Compact Departs from Existing Law Regarding Tribal Preferences ....................................................................11

    B.    Good Cause Exists for the Requested Stay ........................................13

        1.    The Panel Opinion Authorizes a Significant Change in Public Policy Regarding Legalized Gaming that Implicates the Public Interest....................................................................................13

        2.    Bonita Will Be Irreparably Harmed by the Tribe's Statewide Monopoly on Online Sports Betting.........................................15

        3.    Appellants Will Not Be Harmed by a Stay of the Mandate, and the Public Interest Favors Preservation of the Status Quo .......16

CONCLUSION ..........................................................................................18

Pursuant to Fed. Rule App. P. 41(d)(1), Appellees West Flagler Associates, Ltd., and Bonita-Fort Myers Corporation, respectfully request that this Court stay the issuance of its mandate pending disposition of their forthcoming petition for a writ of certiorari. *See* Fed. R. App. P. 41(d)(2)(B)(ii). The mandate is presently set to be issued on September 18, 2023. Appellees further request that, if the motion is denied, the Court stay issuance of the mandate for a reasonable period to permit Appellees to seek a stay from the Supreme Court.

## INTRODUCTION

In this case, the Panel Opinion presents an important question on which Appellees intend to seek Supreme Court review as to the scope of the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701 et seq. Reversing the judgment of the District Court setting aside the Secretary's approval of a tribal gaming compact between the State of Florida and the Seminole Tribe, the Panel Opinion held that a tribe and state may use the process set forth in IGRA to grant exclusive statewide Internet gaming franchises to Indian tribes. This understanding contradicted Congress' clear intent in enacting IGRA which was to provide for gaming "on Indian lands," not to provide a means to introduce Internet gaming statewide.[1] The Panel Opinion further

---

[1] As the Supreme Court held in *Michigan v. Bay Mills Indian Community*, 572 U.S. 782, 795 (2014): "Everything—literally everything—in IGRA affords tools . . . to

1

authorizes the Secretary to provide such approval even where—as here—the law of the state ***prohibits*** the type of gambling in question if conducted off Indian lands. These holdings depart from all other courts' interpretation of IGRA and allow for its misuse in a manner that Congress did not and could not have intended. As such, it raises a "substantial question" warranting Supreme Court review.  Fed. R. App. P. 41(d)(1).

Similarly, the holding of the Panel Opinion that rational basis scrutiny applies to the Secretary's federal approval of a state government's award of a statewide gaming monopoly based on race and ancestry is a "substantial question" warranting Supreme Court review. This holding conflicts with the opinion of the Ninth Circuit in *Williams v. Babbitt*, 115 F.3d 657 (9th Cir. 1997), in which the court held that strict scrutiny should apply to a rule excluding non-natives from the Alaskan reindeer industry because the industry was "not uniquely native," and the preference "in no way relate[d] to native land, tribal or communal status, or culture." *Id.* at 664. It also is at odds with existing Supreme Court precedent in *Morton v. Mancari*, 417 U.S. 535, 554 (1974), in which the Court upheld hiring preferences for Indians in the Bureau of Indian Affairs, but solely because such preferences were "reasonable and rationally designed to further Indian self-government" and could "be tied

---

regulate gaming ***on Indian lands, and nowhere else***."

rationally to the fulfilment of Congress' unique obligation toward the Indians." 417 U.S. at 555. Neither rationale is present here. Finally, the propriety of tribal preferences in and of itself is a question of exceptional importance, as recently recognized by Supreme Court Justice Kavanaugh. *See, e.g.*, *Haaland v. Brackeen*, 143 S. Ct. 1609, 1661 (2023) (Kavanaugh, J., concurring) ("In my view, the equal protection issue is serious.").

There is also "good cause" for the requested stay under Fed. R. App. P. 41(d)(1) as a matter of public policy. Unless the mandate is stayed, this Court's decision will upset the status quo in the entirety of Florida by permitting the Tribe to conduct online sports gaming throughout the State where no such gaming previously has been permitted and where the Florida constitution requires that any expansion of gaming within the State be subject to a citizens' initiative with 60% of the vote. *See* FLA. CONST. Art. X § 30(a). Moreover, the Panel Opinion's unprecedented interpretation of IGRA may well be used by other states and tribes as a blueprint for expanding gaming outside of Indian lands where such gaming generally is not permitted in a state. The Panel Opinion thus enables an extreme shift in public policy on legalized gaming that, once started, may be difficult to stop. It therefore is in the public interest to preserve the status quo with respect to online gaming until such time as the Supreme Court has had a chance to review Appellees' petition for a writ of certiorari.

3

Appellees also will be irreparably harmed by issuance of the mandate. Bonita[2] operates brick and mortar gaming operations in Florida and competes with the Tribe for customers. JA 559. Bonita further submitted evidence that at a minimum, 10%–16% of its customers will shift some of their existing business to online sports gaming that can be offered only by the Tribe, and that it will incur substantially increased expenditures, suffer lost goodwill and suffer additional damages that it likely could not recover from the Tribe due to sovereign immunity issues. JA297–300.

Nor is there any harm to Appellants from a stay: The Secretary has never argued that it will suffer harm from the continued vacatur of its approval. JA458–68. The Tribe, although it is an Appellant by virtue of its appeal regarding its motion to intervene, was not successful in its arguments either before the District Court, JA566–71, or this Court, Op. 23, and therefore cannot claim harm here. Moreover, the Tribe has no right to conduct unlawful gaming and can suffer no harm from the inability to engage in unlawful conduct.

---

[2] Since the inception of this action, Appellee West Flagler sold its Miami-based Magic City Casino to the Poarch Tribe. West Flagler continues to maintain interests in Florida gaming operations, including jai alai.

4

## STATEMENT OF FACTS AND BACKGROUND

On August 11, 2021, pursuant to IGRA, the Secretary approved[3] a tribal-state compact between Florida and the Tribe that among other things, granted the Tribe a monopoly over online sports betting both on the Tribe's lands and throughout the State. To get around IGRA's limitation to gaming "on Indian lands," the Tribe and State relied on contractual and legislative provisions "deeming" the location of electronic bets to occur solely at the place those bets are received—on the Tribe's servers on Indian lands. JA692 (Part IV.A); *see also* JA687 (Part II.CC.2).

Because the Supreme Court has held that "Everything—literally everything—in IGRA affords tools (for either state or federal officials) to regulate gaming on Indian lands, and nowhere else," *Bay Mills*, 572 U.S. at 795, on August 16, 2021, Appellees filed this Administrative Procedure Act case to challenge the Secretary's approval. JA12. The District Court granted summary judgment to Appellees, finding the "deeming" language to be a "fiction," and set aside the Secretary's approval of the Compact. JA573.

On June 30, 2023, this Court reversed. The Panel Opinion significantly expanded the existing scope of IGRA by holding that an IGRA Compact can include

---

[3] The Secretary approved the Compact through inaction after 45 days, as permitted by 25 U.S.C. § 2710(d)(8)(C).

(but not specifically "authorize") an agreement for a tribe to conduct gaming ***off Indian lands***, so long as the Compact also includes and authorizes provisions for gaming on Indian lands. Op. 10. The Panel Opinion also held that the grant of a statewide monopoly on gaming on the basis of race or ancestry was subject only to rational basis scrutiny. Op. 20.

On August 14, 2023, Appellees filed a petition for rehearing *en banc*, which this Court denied on September 11, 2023. Absent a stay, the mandate will be issued on September 18, 2023. *See* Fed. R. App. P. 41(b).

## ARGUMENT

To obtain a stay of the mandate "pending the filing of a petition for a writ of certiorari in the Supreme Court," a movant "must show that the [certiorari] petition would present a substantial question and that there is good cause for a stay." Fed. R. App. P. 41(d)(1). This requires a party to demonstrate a reasonable probability of succeeding on the merits and injury absent a stay. *See, e.g.*, *United States v. Warner*, 507 F.3d 508, 510–11 (7th Cir. 2007) (Wood, J., in chambers); *Nara v. Frank*, 494 F.3d 1132, 1133 (3d Cir. 2007); *California v. Am. Stores Co.*, 492 U.S. 1301, 1307 (1989) (O'Connor, J., in chambers).

Appellees meet this standard here. This case raises substantial legal issues of the type appropriate for Supreme Court review, including the propriety of a novel expansion of federal statutory law regarding Indian gaming and a Constitutional

question regarding the propriety of tribal preferences under the Equal Protection Clause. In addition, without a stay of the mandate, the Tribe shortly will effect a major expansion of gaming in Florida by releasing a mobile phone application that will permit online sports betting throughout the state. Although Supreme Court review could later result in the Tribe's discontinuance of such gaming, the interim harm caused by the conduct of unlawful gaming in Florida against the wishes of Florida voters cannot be undone. *See Texas v. Ysleta del Sur Pueblo*, 2018 WL 1566866, at n.13 (W.D. Tex. Mar. 29, 2018) ("The alleged beneficial impact of revenue from [a casino] does not entitle [the Tribe] to engage in illegal activity to ensure the facility's viability."), *rev'd on other grounds*, 152 S. Ct. 1929 (2022).

### A. The Panel Opinion Raises "Substantial Questions" of Law

Appellees' forthcoming petition for certiorari will present "substantial question[s]" for the Supreme Court's review on which Appellees have at least a reasonable probability of success. Fed. R. App. P. 41(d)(1).

### 1. The Panel's Interpretation of IGRA Significantly Expands IGRA's Scope and Authorizes Significant Expansions of Legalized Betting Throughout the Country

First, the Panel Opinion raises important questions regarding the interpretation of federal statutory law and its impact on important public policy concerns. Prior to the Panel Opinion, no IGRA case ever had interpreted the statute to permit the Secretary to approve a compact purporting to authorize gaming ***off***

7

Indian lands, thereby largely limiting the public policy impact of IGRA to tribal lands. Now, however, the Secretary may properly approve a compact between a tribe and multiple states for a multi-state gaming operation so long as ***any portion*** of the gaming at issue occurs "on Indian lands." The Panel Opinion premised this expansion of IGRA law on two theories, both of which shoehorn a statewide expansion of gaming into a narrow statutory list of specific ancillary subject matters that may be included in a tribal-state compact. The Panel Opinion reasoned that the statewide, off-reservation gaming contracted for in the Compact is: 1) an "allocat[ion of] jurisdiction between Florida and the Tribe" under 25 U.S.C. § 2710(d)(3)(C)(i)–(ii), Op. 11; and/or 2) permitted under a residual catch-all clause for the permitted ancillary matters that permits provisions on "any other subject that are directly related to the operation of gaming activities," under 25 U.S.C. § 2710(d)(3)(C)(vii), Op. 13.[4] Either way, the Panel Opinion reasons, the Compact merely "discusses," but does not "authorize" gaming off Indian lands, thereby falling outside the scope

---

[4] The placement of an online wager from ***off*** Indian lands is not "directly related to" gaming. Rather it *is the gaming itself*. The federal government has repeatedly taken the position that a wager occurs both where made and where received. *See, e.g.*, Br. for the United States of America as Amicus Curiae Supporting Appellee, *Coeur d'Alene Tribe v. AT&T Corp.*, 1999 WL 33622333, at *13–14 (9th Cir. Case No. 99-35088, July 20, 1999) ("It follows that 'wagering,' 'gambling,' or 'gaming' occur in both the location from which a bet, or 'offer,' is tendered and the location in which the bet is accepted or received."). The Panel's Opinion, however, fails to recognize this inconsistency.

of IGRA. Op. 12. No case has ever read these provisions so expansively, and the Opinion therefore diverges from other Circuits' precedent. *See Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024, 1034 (9th Cir. 2022); *Navajo Nation v. Dalley*, 896 F.3d 1196, 1205 n.4 (10th Cir. 2018); *Flandreau Santee Sioux Tribe v. Noem*, 938 F.3d 928, 935 (8th Cir. 2019).[5]

This novel interpretation of IGRA lays the groundwork for future abuses of IGRA, as a tribe and state now may use an IGRA compact to expand tribal gaming throughout an entire state, and the Secretary has no obligation to disapprove—or even question—the propriety of that agreement. Although the Panel Opinion suggests that *state* courts may review the propriety of such an agreement, Op. 16–17, tribes may well successfully assert sovereign immunity to avoid any such inquiry, (*see* Tribe's Principal Br., Doc # 1959733), thereby permitting state officials and tribes to use the federal IGRA process to circumvent state restrictions on expansions of gaming.

The Panel Opinion reasons that the Secretary cannot control what gaming Florida permits on non-Indian lands within its borders. Op. 16–17. But that is not

---

[5] The Panel's reading of the Compact also contradicts the Compact's plain text. *See* JA692 (providing that the "Tribe and State agree that the Tribe is **_authorized_** to operate Covered Games on its Indian lands, as defined in [IGRA]" (emphasis added)); JA676, 687 (defining "Covered Games" to include "Sports Betting," which in turn is defined to include online, **_off-reservation_** wagering from **_anywhere in the State_**).

the same question as whether Florida and the Tribe may *use the statutory IGRA process*, which includes Secretarial approval, to contract for that off-reservation gaming. An agreement to give the Tribe a monopoly over gaming in the entire state certainly does not belong in an IGRA compact. Nor should the Secretary allow the federal statutory compacting process to become a vehicle for state officials to defeat the will of their citizens, which is the effect of the Panel's decision here.

This holding also contradicts the Supreme Court holding that "Everything— literally everything—in IGRA affords tools (for either state or federal officials) to regulate gaming on Indian lands, and nowhere else." *Bay Mills*, 572 U.S. at 795. The Panel interprets *Bay Mills* as permitting a state to contract with a tribe for off-reservation gaming. Op. 4. But *Bay Mills* holds only that IGRA's abrogation of tribal sovereign immunity does not apply to gaming off Indian lands, 572 U.S. at 785, not that the IGRA compacting process is an appropriate vehicle for a state and tribe to agree to such gaming.

Whether IGRA is properly interpreted to permit such ruses is a substantial question of federal statutory interpretation appropriate for Supreme Court review with important public policy implications for state and tribal relations, and for the propriety of mass expansions of legalized gaming operations.

10

## 2. The Panel's Analysis of the Propriety of the Tribal Preference Granted by the Compact Departs from Existing Law Regarding Tribal Preferences

Second, the Panel's application of rational basis review to Appellees' claims under the Equal Protection Clause also raises a question of substantial importance that is appropriate for Supreme Court review. The Panel Opinion holding, Op. 20, concerns the propriety of tribal preferences—an issue recently acknowledged by the Supreme Court as one of exceptional importance. *See, e.g.*, *Haaland*, 143 S. Ct. at 1661 (Kavanaugh, J., concurring) ("In my view, the equal protection issue is serious."). Both the Compact and Implementing Law award a statewide monopoly to the Tribe on the basis of race and ancestry and to further that monopoly, create a criminal law structure that applies to gaming ***off of*** Indian lands also based upon race and ancestry. FLA. STAT. § 849.14; FLA. STAT. § 849.142(1); JA692, JA676, JA687. No prior case has ever permitted such preferences under the Equal Protection Clause.

The Panel Opinion's expansive Equal Protection holding consists of only a cursory analysis, Op. 20, that conflicts with the decision of the Ninth Circuit in *Babbitt*, 115 F.3d 657. *Babbitt*—which was not discussed in the Panel Opinion—held that strict scrutiny should apply to a rule excluding non-natives from the Alaskan reindeer industry, *id.* at 664, 666, because the industry was "not uniquely native," and the preference "in no way relate[d] to native land, tribal or communal

11

status, or culture," *id*. at 664.

The Panel Opinion also is at odds with existing Supreme Court precedent in *Mancari*, 417 at 554, in which the Court upheld hiring preferences for Indians in the Bureau of Indian Affairs only on the basis that such preferences were "reasonable and rationally designed to further Indian self-government" and could "be tied rationally to the fulfilment of Congress' unique obligation toward the Indians." *Id*. at 555. Neither rationale is present here. Consistent with *Babbitt* and *Mancari*, prior courts considering tribal preferences have applied rational basis review only to preferences tied to Indian lands, to uniquely sovereign interests, or to the special relationship between the federal government and Indian tribes.[6]

The Panel Opinion's expansion of tribal preferences to permit disparate treatment in off-reservation commercial activity and the application of criminal laws based on race and ancestry is a question of substantial importance that is appropriate

---

[6] *See United States v. Antelope*, 430 U.S. 641, 646 (1977) (federal regulation of criminal conduct within Indian country); *Moe v. Confederated Salish & Kootenai Tribes*, 425 U.S. 463, 480 (1976) (tax "on personal property located within the reservation," fee "applied to a reservation Indian conducting a cigarette business for the Tribe on reservation land," and tax on "on-reservation sales by Indians to Indians"); *Fisher v. District Court*, 424 U.S. 382, 389 (1976) (on-reservation adoption proceedings); *United States v. Garrett*, 122 F. App'x 628, 631 (4th Cir. 2005) (gaming *on* tribal lands); *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 735 n.16 (9th Cir. 2003) (same and holding that limitation to Indian lands is "critical").

for Supreme Court review.

### B. Good Cause Exists for the Requested Stay

#### 1. The Panel Opinion Authorizes a Significant Change in Public Policy Regarding Legalized Gaming that Implicates the Public Interest

Good cause for a stay exists here because the Panel Opinion authorizes a substantial shift in Florida's public policy regarding the expansion of legalized gambling, and further provides a blueprint for other states to do the same. In 2018, Florida voters spoke: they passed a constitutional amendment requiring "a vote by citizens' initiative"—a statewide referendum—"for casino gambling to be authorized under Florida law." FLA. CONST. art. X, § 30(a) ("Voter Control of Gambling in Florida"). That amendment, although a creature of state law, incorporates federal law, i.e., IGRA, by carving out an exemption to the general prohibition on expansions of gaming for "gaming compacts [negotiated] pursuant to the Federal Indian Gaming Regulatory Act for the conduct of casino gambling on tribal lands." *Id.* at § 30(c). The Compact, as interpreted under the Panel Opinion, permitted the Tribe and Florida officials to circumvent the Florida constitution by shoehorning the off-Indian land sports gaming provisions into the IGRA exception to the Florida Constitution.

That Florida and the Tribe likely will argue that these acrobatics are permissible under Florida law (even if engineered specifically to avoid state judicial

13

scrutiny) is beside the point for purposes of this motion. There is no doubt that, upon the issuance of the mandate in this matter, the Tribe will commence a statewide online sports betting operation accessible to every adult located in Florida. JA510–20.[7] Florida's citizens have not authorized this major shift in public policy. If either the Supreme Court or a Florida court determines in the future that the Tribe and Florida officials acted unlawfully, Florida's citizenry will have been irreparably harmed by the conduct of a wide-spread illegal gaming operation in the interim. *See, e.g.*, *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1483 (2018) (interpreting federal law to "respect the policy choices of the people of each State on the controversial issue of gambling"); *id.* at 1484 ("The legalization of sports gambling is a controversial subject."). Moreover, if the unlawful gaming is permitted to commence on a statewide basis, it will be difficult to unwind that action if the Compact is later found to have been unlawful. The transformative nature of legalizing sports betting by any adult with a mobile device in Florida is not an egg that can be easily unscrambled.

---

[7]   There is also the possibility that other states and tribes may seek to abuse the IGRA approval process to further expand online gaming operations across state lines following the Panel decision.

14

### 2. Bonita Will Be Irreparably Harmed by the Tribe's Statewide Monopoly on Online Sports Betting

If the Tribe is permitted to launch a statewide online sports betting operation, Bonita (and other non-tribal operators of gaming facilities who are foreclosed from entering the lucrative online sports betting market) will be irreparably harmed. Bonita will suffer lost revenue and profits, increased expenses, and diminished goodwill. Sworn testimony established below that at least 10%–16% of Bonita's customers will shift business to the new Compact-created statewide tribal monopoly. JA297. Such irreparable harm provides good cause to stay the mandate. *See also Quality Carriers, Inc. v. MJK Distrib., Inc.*, 2002 WL 506997, at *12 (S.D. Ill. Apr. 3, 2002) (finding irreparable harm in business where "goodwill takes years to build up and only seconds to lose").

To be sure, courts routinely reject *economic* harm as reparable through litigation. *See Sampson v. Murray*, 415 U.S. 61, 61–62 (1974). But the economic nature of Bonita's harm is immaterial where—as here—sovereign immunity would preclude it from recovering damages. *See Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988); *Kiowa Tribe of Okla. v. Mfg. Techns., Inc.*, 523 U.S. 751, 760 (1998); *Gamble v. Fla. Dep't of Health & Rehab. Servs.*, 779 F.2d 1509, 1512 (11th Cir. 1986). If "the plaintiff in question cannot recover damages from the defendant due to the defendant's sovereign immunity . . . *any* loss of income suffered by a plaintiff is irreparable *per se*." *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008)

15

(citing *United States v. New York*, 708 F.2d 92, 93–94 (2d Cir. 1983)). Bonita's harm is therefore completely cognizable—and even compelling—for purposes of equitable relief.

### 3. Appellants Will Not Be Harmed by a Stay of the Mandate, and the Public Interest Favors Preservation of the Status Quo

Appellants would not be prejudiced by a stay, and the public interest favors allowing Appellees a full opportunity to seek Supreme Court review before the Tribe launches unlawful gaming activities while the case is pending.

First, the Secretary and Department of the Interior will not be harmed by the proposed stay. In the context of a stay, assessing the harm to the opposing party and weighing the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). As discussed in Section B1 above, there is a strong public interest in not permitting an illegal gaming scheme to begin operations where doubt over its legitimacy exists. Moreover, governmental compliance with federal law is in the public interest. *Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*, 513 F. Supp. 3d 154, 176 (D.D.C. 2021). Accordingly, "there is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters v. Newby*, 838 F.3d 1, 13 (D.C. Cir. 2016) (collecting cases); *accord Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 81–82 (D.D.C. 2020). Here, the Compact creates a gambling scheme that violates state and federal laws and makes unwitting bettors

16

into accomplices in the violations of those laws.

Second, the Tribe has no standing to claim harm from the stay sought by Appellees. Although the Tribe moved to intervene in this litigation, that motion to intervene was denied by the District Court, JA566–71, a decision affirmed by the Panel Opinion, Op. 23. Moreover, even if it were entitled to assert a claim of harm from delaying the launch of its online gaming operation, that harm would be solely economic in nature. It is well settled that "[e]conomic loss does not, in and of itself, constitute irreparable harm," *Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 108 (D.C. Cir. 1986) (citation omitted). Here, no amount of economic harm claimed by the Tribe can overcome the strong public interest "in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters*, 838 F.3d at 12 (citation omitted). Further, the Tribe can "'have no vested interest in an illegal business activity' and any loss of income from an illegal activity is not an irreparable harm." *See United States v. RX Depot, Inc.*, 297 F. Supp. 2d 1306, 1310 (N.D. Okla. 2003). Interior might cloak its decisions in the guise of promoting tribal revenue, "[b]ut our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2490 (2021).

17

## CONCLUSION

Appellees respectfully request that this Court stay issuance of the mandate pending resolution of Appellees' anticipated petition for a writ of certiorari with the U.S. Supreme Court. Alternatively, Appellees request that the Court stay the mandate for a sufficient period of time to permit Appellees to apply for a stay of the mandate from the Supreme Court.

September 15, 2023

Respectfully submitted,

By: /s/ *Hamish P.M. Hume*
**BOIES SCHILLER FLEXNER LLP**

Hamish P.M. Hume
Amy L. Neuhardt
Samuel C. Kaplan
1401 New York Avenue, N.W.
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
hhume@bsfllp.com
aneuhardt@bsfllp.com
skaplan@bsfllp.com

Jon Mills
100 SE Second Street, Suite 2800
Miami, FL 33131
Tel: (305) 539-8400
Fax: (305) 539-1307
jmills@bsfllp.com

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

This document complies with the word limit of Fed. R. App. P. 35(b)(2)(A) because it contains 4,191 words, excluding the exemptions in Fed. R. App. P. 32(f) and DC Circuit Rule 32(e)(1).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

*/s/ Hamish P.M. Hume*

Hamish P.M. Hume
1401 New York Ave, N.W.
Washington, DC 2005
Tel: (202) 237-2727
Fax: (202) 237-6131
hhume@bsfllp.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2023, this document and all its attachments were filed with the Clerk of the Court of the United States Court of Appeals for the D.C. Circuit by using the CM/ECF system, which will automatically generate and serve notices of this filing to all counsel of record.

Dated: September 15, 2023

/s/ Hamish P.M. Hume
Hamish P.M. Hume
1401 New York Ave, N.W.
Washington, DC 2005
Tel: (202) 237-2727
Fax: (202) 237-6131
hhume@bsfllp.com